1. Where one purchases land and assumes the payment of an outstanding indebtedness thereon and is sued on his assumption, and seeks to avoid liability on the ground of fraud, he must, upon the discovery of the facts constituting the fraud, at once announce his purpose to rescind, adhere to it, and make an offer to make restitution. If he remain silent, retain possession of the property so purchased, without complaint promptly after the discovery of the fraud, he will be held to have waived it, so far as it might be claimed as ground for rescission or avoidance of the contract, and will be bound for the purchase-price as though no fraud had occurred. Code, § 20-906; and compare Smith v. Estey Organ Co., 100 Ga. 628 (28 S.E. 392); Garner v. Butler, 144 Ga. 441 (87 S.E. 471); Cabaniss v. Dallas Land Co., 144 Ga. 511 (87 S.E. 653); Couch v. Crane, 142 Ga. 22 (82 S.E. 459); Williams v. Fouche, 157 Ga. 227
(121 S.E. 217); Gibson v. Alford, 161 Ga. 672, 685
(5) (132 S.E. 442).
2. A court of equity will not relieve a purchaser of land from his own negligence in not ascertaining facts which he could have ascertained by diligence, instead of relying on the statements of the seller, the latter using no artifice or fraudulent scheme to prevent the purchaser from ascertaining facts which might have prevented him from purchasing. The evidence failing to show that the purchaser had no such opportunity, *Page 712 
or that he was prevented by the fraud or artifice of the seller from making such examination, he can not avoid the payment of the purchase-price on the ground of false representations made to him by the vendor or his agent. Compare Arthur v. Brawner, 174 Ga. 477 (163 S.E. 604), and cit.; Morrison v. Colquitt County, 176 Ga. 104
(167 S.E. 321), and cit.; Browning v. Richardson, 181 Ga. 413
(182 S.E. 516), and cit.; Wrenn v. Truitt, 116 Ga. 708
(43 S.E. 52).
 No. 13023. FEBRUARY 24, 1940.
Irving D. Karpas brought his action in equity jointly and severally against the Peachtree Street Corporation and Walter T. Candler for recovery upon certain promissory notes which the Peachtree Street Corporation executed to plaintiff on February 1, 1930, and which it secured by a deed to certain parcels of real estate in Atlanta, Georgia; the allegations showing that this real estate was later sold by the Peachtree Street Corporation to Walter T. Candler, and that the deed to him contained the recital that as a part of the consideration of the purchase of the same realty he assumed and agreed to pay the then outstanding notes above referred to It was alleged that the notes in question were a series of notes aggregating $225,000 principal and payable to the order of the plaintiff in the sum of $25,000 on May 1, 1930, $4166.66 on February 1, 1931, and severally thereafter in the sum of $4166.66 each on the first day of each month, until, and inclusive of, January 1, 1935, together with coupon notes representing an agreed rate of interest. The security deed vested in the plaintiff the right to declare the entire debt due, and to foreclose against the property in the event of default in the payment of any note for five days or more. It was alleged that Candler paid all notes maturing prior to May 1, 1932, but those maturing on that date, and subsequently, he permitted to go into default; that upon default of the notes maturing in May and June, 1932, petitioner exercised his option to foreclose, and sold the property under this power, himself buying it for $1000, but subject to an outstanding prior lien in favor of an insurance company currently pending against the property at the time of the purchase by the Peachtree Street Corporation and the resale to Candler.
The defendant Peachtree Street Corporation, while acknowledging service, filed no defensive pleadings. *Page 713 
The defendant Candler filed his answer and admitted many of the allegations of the petition, but denied that the assumption of the indebtedness by him was valid and binding. He pleaded that the agreement to assume was obtained by fraud in that the Peachtree Street Corporation had falsely represented that the entire building was leased to good and solvent tenants on long terms at rentals more than sufficient to meet the obligations for interest and taxes against the property and yield a profit; that when he came to close the contract of purchase he discovered that two fifths of the building were only under a percentage rental; that when he refused to close the trade Grier, the president of the Peachtree Street Corporation and sole owner of all its stock, represented that he was a good and solvent individual and that he personally would take a lease as tenant from his corporation to the said two fifths of the store property, and on behalf of his corporation executed to himself as tenant a lease to said property; and defendant alleged that at that time Grier, if not actually insolvent, at least was very greatly involved financially and knew that the lease signed by him was not a good and solvent lease, and that he misled defendant into purchasing the property by representing that he was amply able to pay and would pay the rental stated in the lease; that shortly thereafter Grier defaulted on the lease and failed to pay the rent, and the other tenants who had been represented to Candler as good and solvent tenants also defaulted and failed to pay their rents. He alleged that the misrepresentation with reference to the solvency of Grier and the other tenants was made with the express intended purpose of misleading him, and did so mislead him, and that he therefore has a good defense against the Peachtree Street Corporation, which, he alleged, could not enforce against him the assumption of the indebtedness, and that if the same could not be enforced by the Peachtree Street Corporation the plaintiff in this case can not enforce the same. Candler further pleaded that while the property had been sold under foreclosure as alleged, the price for which it sold was grossly inadequate, inequitable, and unfair, and that the petitioner made no proper effort to secure a fair price in the market when buying it himself.
The record further shows that at the beginning of the case the defendant Candler admitted a prima facie case in the plaintiff; *Page 714 
that is to say, he admitted that the allegations as set out in the plaintiff's petition entitled the plaintiff to a judgment against him unless he should establish a legal defense to that set of facts which is contained in the petition, and Candler thereby assumed the burden of proof in the case.
Mr. Baldwin, a real-estate agent, testified as a witness for Mr. Candler in substance and in part as follows: That he would carry a message from Mr. Candler to Mr. Grier, get a counter proposition from the latter and return to Atlanta; that he was "nothing but a go-between between the parties to close the deal;" that after he represented to Mr. Candler that the real estate in question was bringing a gross yearly rental of $66,000, Mr. Candler was interested in purchasing it for a stated sum, but it developing that one particular lease was on a percentage basis and was not bringing the amount per month that it was supposed to have been bringing, Mr. Candler said that he was not interested in purchasing the property unless it was bringing the rental first represented, because he had made his calculations based on those figures as rentals. Baldwin then saw representatives of the owner and told them the situation, and Mr. Grier, the president and sole owner of the stock of the Peachtree Street Corporation, finally agreed to lease to himself that portion of the property which was leased on a percentage basis, or guarantee the lease. Baldwin told Candler that it was his information and opinion that Mr. Grier was a very wealthy man; that he was told by some of his (Grier's) associates that he was worth around fifteen million dollars. It was after these representations to Mr. Candler and the signing of the lease by Mr. Grier that the trade for the sale of the real estate to Candler was consummated. Baldwin further testified: "As to who represented the worth, or what Mr. Grier was worth — why that was ever brought out, — one reason was, I was trying to find out the worth of the man in order to get Mr. Candler to accept him on a lease instead of the lease that was on the property. I don't know whether Mr. Candler brought it up or whether I just said it to him voluntarily. . . Mr. Candler didn't tell me that before he would sign the lease Mr. Grier had to guarantee him that he was able to pay that lease. No such statement as that was made. It was not a condition precedent to the signing of this contract that Mr. Grier was worth a certain amount of money." *Page 715 
Mr. Candler testified, in part: "Mr. Baldwin was the real-estate man who negotiated that sale with me. A representation was made to me at the time by Mr. Baldwin as to the type or the solvency of the leases referred to there in that $66,000 worth of leases. Mr. Baldwin, of course, when he put this proposition up to me, said these stores were all filled and this was the rental they were bringing, that is the yield, and that they were good concerns and no reason to expect them not to be. I think the day we came to Mr. Thomson's office to close this matter up, it developed they didn't have the lease with the Davis store, $2000 a month, as I remember it. Mr. Baldwin then said he would get a good and valid lease to make sure. He offered me a lease from the Davis Company and Mr. Grier. Mr. Grier was the owner of Davis Company, and it was to be guaranteed by Mr. Grier. As to whether he made any representations as to Mr. Grier's financial condition, yes, he told me at the time that Mr. Grier was the owner of a great many stores and chain stores, and I think at that time he named four in Atlanta, and I believe he had one in Birmingham, Columbia, and Nashville probably. . . As to whether he summed up anything about what he was worth, he said Mr. Grier had large means, that's what he told me. I agreed to take the property provided I could get this lease to Mr. Grier. As to whether I made investigations for myself, or relied on Mr. Baldwin, I relied on Mr. Baldwin. . . I did make an investigation from Dun Bradstreet, which showed that he had these various stores throughout the country. Mr. Baldwin brought me those reports. I made no independent investigation. . . As to whether I remember there were some thirty-odd stores he was interested in, I don't know how many. I know he had a lot."
Mr. Grier testified for the plaintiff: "I don't recall the exact date when Mr. Candler purchased the property. I do recall that he did purchase it. I did not at any time make any representations, or authorize any one to make any representations as to the value of my estate, my means; as to what I was worth. I did not know that any representations had been made. I can't say exactly just what my assets were at that time, on December 29, 1930 [the date the property was sold to Candler]. I owned some interest in some stores. As to what interest I owned in these stores. I owned 58,000 shares out of an issue of 120,000. Thirty-eight stores were *Page 716 
involved, in all of which I did own this interest. Some of these stores were in Atlanta. . . The book value, as best I could get at it, of my stock in those corporations was, I should say, a little over a million dollars. . . I might say I had about two hundred thousand equity or value in those stocks. I owned real estate outside of this. The value of that real estate was approximately about six hundred thousand, I mean the value of the equities. I have furniture in my home. I should judge it would be at that time of the value of a hundred and fifty or two hundred thousand dollars. I owed some money. As to how much I owed, under two hundred thousand dollars. The position I had at that time was that I was president of the company. For that I drew an annual salary of $75,000 a year."
The testimony of Mr. Geist, the New York attorney representing Mr. Grier, and with whom Baldwin dealt in attempting to make a sale of the real estate, testified that he did not make any representations as to the financial worth or the holdings of Mr. Grier, and that that question was not presented when he met Mr. Candler in his office.
Under the direction of the court, after the introduction of evidence, the jury returned a verdict for principal, interest, and attorney's fees, as prayed, against Peachtree Street Corporation. The jury, to whom the issues between the plaintiff and the defendant Candler were submitted by the court, returned a verdict for the defendant Candler. The plaintiff made a motion for new trial, on both general and special grounds, which motion was overruled, and the plaintiff excepted.
After a careful examination of the record in the instant case we have reached the conclusion that the motion for new trial should have been granted on the ground that the verdict is without evidence to support it. There was no demurrer to the petition, but the defendant admitted a prima facie case and defended on the ground of fraud. There was no demurrer to the answer. We can not construe the pleadings any other way except as asserting a contention that there was no liability to the plaintiff because of certain alleged fraud which it was claimed voided the entire transaction. Whether the answer was sufficient *Page 717 
for that purpose is a question not presented for decision. Even if it should be assumed that the evidence was sufficient to show that the representations were untrue, and that they were of such a character as could be the basis of fraud, nevertheless, applying to the record before us the principles enunciated in the headnotes, the defendant is not entitled to the verdict which he obtained. The evidence shows without dispute that Candler did not promptly upon the discovery of the fraud offer to rescind; that there was no reason why he should have relied on what Baldwin said to him as to the financial worth of Grier.
Since we have held that the verdict is contrary to the evidence, and therefore contrary to law, it becomes unnecessary to pass upon the special grounds of the motion.
Judgment reversed. All the Justices concur.