1. A demurrer to an original petition does not, without more, cover the petition after it has been amended in material respects; but in such case the demurrer should be renewed if it is still relied on.
(a) While the defendant did renew her original demurrer as well as file an entirely new demurrer attacking the petition as amended, she excepted only to the order overruling her original demurrer, and the subsequent rulings, not having been challenged in any manner, became the final law of the case as related to the demurrers. In the circumstances, the exceptions to the original order present only a moot question, and will not be decided.
2. Where evidence tends to support the allegations of a petition, its admissibility may not be questioned by an objection that the petition does not state a cause of action, or that the evidence would not establish a right to recover.
3. In a suit by the grantee to cancel a deed to land, where one of the issues for determination related to the plaintiff's mental condition, testimony of a non-expert witness that he had known the plaintiff for about thirty years, and that about the time of the transaction the plaintiff "was not normal, he was not what he had been," was subject to objection as a mere conclusion of the witness, long acquaintance being the only fact given as basis therefor, and this alone being insufficient for the purpose.
(a) The mere circumstance, however, that certain evidence may within itself fall short of proving a fact which the party offering it seeks to establish is not a sufficient reason for excluding it. Unless otherwise objectionable, it should be admitted, even though it may only tend to prove the matter in issue.
(b) Accordingly, testimony relating to the conduct, appearance, and statements of the plaintiff, and tending to show subnormal mental capacity, as alleged in the petition, was properly admitted over objections that it was insufficient for the purpose for which it was offered, did not show incapacity to contract, and was irrelevant.
4. Any representation, act, or artifice intended to deceive, and which does deceive another, is such a fraud as may authorize cancellation of a written contract; but a party to a contract who can read must read or show a legal excuse for not doing so; and ordinarily, if fraud is the excuse, it must be such fraud as prevents the party from reading. Nor in such case will a mere fraudulent statement by the opposite party or his agent as to the contents of the writing furnish a legal excuse; and where the contract is a deed to land, the rule will generally apply to the grantee as well as the grantor.
(a) In the instant case, some parts of the judge's charge to the jury were inconsistent with the foregoing principles, and were apparently harmful to the defendant, the losing party in the trial court.
5. There being no evidence of mutual mistake as to the contents of the deed, the portion of the charge relating to rescission for mutual mistake was erroneous, as contended, in that it submitted a theory not supported by the evidence.
6. The charge on reformation for mutual mistake was likewise erroneous *Page 641 
as unwarranted by the evidence; but the error might have been harmless, as the jury made no finding on the prayer for reformation.
7. It is declared in the Code, § 37-710, that "Great inadequacy of consideration, joined with great disparity of mental ability in contracting a bargain, may justify equity in setting aside a sale or other contract." A charge evidently based on this principle, but not in the exact language of the Code, was not erroneous for any reason assigned. There was no exception on the ground that the language employed was not the equivalent of that contained in the Code.
(a) For the reasons stated in notes 4 and 5 above and the corresponding divisions of the opinion, as applied to the defendant's motion for a new trial, it was error to overrule the motion.
 No. 13977. FEBRUARY 13, 1942. REHEARING DENIED MARCH 17, 1942.
On November 9, 1939, R. A. Barnett accepted a deed signed by Mrs. Emma Hudspeth Livingston, purporting to convey to him described land in consideration of $2500 paid, the description referring to two tracts in lot 172 and one tract in lot 195, in the 8th district of Baker County, aggregating about 125 acres. In describing one tract, there was excepted "what is known as the Mrs. Emma Livingston home lot," and following a description of all the land was this statement: "It is the intention of the grantor herein to convey all of the lands she has title to off lots of land (172) one hundred and seventy-two and (195) one hundred and ninety-five in the eighth district of Baker County, Georgia, except such land as is contained in what is known as the Mrs. Emma Hudspeth Livingston home lot." Thirteen days afterwards, to wit, on November 22, 1939, Barnett filed against Mrs. Livingston a petition in equity, seeking rescission of the contract and recovery of the sum paid, the alleged grounds for such relief being: (1) fraudulent representations by an alleged agent of the defendant, as to the value of the land, especially for use in the livestock business, and as to the desire of the alleged agent (Dan Miller) to form a partnership with the plaintiff for the use of the land in such business; (2) fraudulent insertion of the excepting clause in the deed of conveyance, the plaintiff having accepted the deed without reading it, on express assurance from such agent that it "was all right and in accordance with their agreement," which agreement as actually made included "the home place;" and (3) great inadequacy of consideration, in that the land conveyed was of very small value, "not exceeding $500," as compared with the amount paid, coupled *Page 642 
with great mental disparity as between the plaintiff and such alleged agent, with whom it is averred the plaintiff dealt.
The defendant demurred generally and specially. The demurrer was overruled on all grounds, and the defendant excepted pendente lite. Thereafter the plaintiff amended by adding certain allegations to one paragraph, and by adding also a second count in which he sought to have the deed reformed by striking the excepting clause last above quoted. The defendant then renewed her demurrers, general and special, as theretofore filed, and they were again overruled. She also demurred generally and specially to the petition as amended, which demurrer was in like manner overruled on all grounds. The defendant took no exceptions to either of the two rulings last mentioned. The defendant filed answer denying all allegations of the original petition as to fraud, inadequacy of consideration, and mental disparity. Upon the trial the jury found a verdict in favor of the plaintiff "for a rescission of the contract;" whereupon the court entered a judgment decreeing such rescission, and recovery of the sum paid. There was no verdict on the second count. The defendant filed a motion for a new trial, which she later amended by adding twenty-seven grounds, nine of them assigning error on the admission of evidence, sixteen complaining of excerpts from the court's charge, and the remaining two containing exceptions to omissions to charge. The motion as thus amended was overruled, and the movant excepted. The original bill of exceptions complained only of the judgment refusing a new trial, but an amendment was offered, assigning error on the exceptions pendente lite as taken by the defendant to the overruling of her original demurrer.
The evidence tended to show that the land actually conveyed was not worth more than $500, this being the value alleged in the petition, and that "the home place" which was excepted was worth at least twice that amount. There was no evidence that any fraud was used to prevent the plaintiff from reading the deed before accepting, it, unless the testimony of the plaintiff, admitted without objection, to the effect that his attorney read the petition to him and that "it is the truth," should be considered as such evidence; nor was there any evidence of confidential relation.
The plaintiff's entire testimony was as follows: "Dan Miller called me around to his store and said, `How about selling you *Page 643 
that pasture lot?' . . I went around there on . . November 9, 1939. He said, `How about me selling you this barn? It belongs to my wife, but I can get her to make the deed,' and he said, `I want us to go in the live-stock business here, and I want to sell it to you.' I told him, `Dan, I don't have any business with that,' and he said, `I know you have got the money and you need the barn,' and I said, `Dan, I don't need it,' and he said that in 1938 he and Mr. Hall and somebody went into business and made a thousand dollars a month; and I left and went up to the house and did not have any more conversation. He said, `I want you to furnish the money and go in business, and we can make plenty of money.' He said, `Alton, I want to go in business with you,' and said, `I can make plenty of money for you and me too;' and I said, `Dan, you know I don't want to go in business with you, because I know that you will take everything if you get a chance;' and he said, `We got along all right so far.' I believed his statement that he had made $3000 in three months. I bought it because I thought I could make some money. I intended going in business with Mr. Miller after purchasing the barn. The next morning Dan said, `In going into this business, we need some grazing land.' Dan and I went on down to the barn, and Dan started telling me about what good pasture it was, and I said, `I know, because my colts were in there for two months and liked to [have] died,' and I said, `It is not worth more than two hundred fifty dollars,' and he said, `Yes, it is.' Then he said, `Mrs. Livingston, my mother-in-law, is going to live with me at my house,' and said, `We done rented out the home for twenty-five dollars a month to Mr. Ben Thomas,' and I said, `I don't want to pay twenty-five hundred dollars for just the pasture,' and he added the house and lot in with the pasture. I did not know it was not in the deed until my wife read the deed to me, and I said, `The house and lot is not included with the pasture;' and that night Mr. Merritt came up to my house and said he was running for clerk of the court and wanted me to vote for him, and I told him I could not vote for him, and he sat down and said that he would like for Elizabeth and Mrs. Barnett to vote for him. After awhile he went outside, and he said, `Dan said for me to come down the next morning, because Dan had the deeds and would turn everything over to you.' He said, `Dan told me that you were to come down in the morning and sign those deeds up, *Page 644 
and he notified me.'" Q. "Did you go down the next morning?" A. "I did, and there was a crowd of them in there, and they did not show me the deeds. In other words, I gave them a check for the amount of twenty-five hundred dollars. In dealing with the purchase of this land I did not have any conversation or transaction with anybody but Dan Miller. As a result of the trade I gave the check to Dan Miller. I don't remember exactly how long it was before I discovered that the house and lot was excluded. It was my wife — about a week after the trade, as soon as she saw the deed she found that the house and lot was not included. . . All of the transaction with reference to the pasture land was with Dan Miller. Every statement made to or by me was made to me by Dan Miller and by me to Dan Miller. It was closed with Dan Miller and me. I swore to this petition. I did not read it. I did not have my glasses. Mr. Farkas read it over to me. It is the truth. What is set out in the amendment is true. I signed it this morning. I swore to it. I had a stroke of paralysis about four or five years ago. . . I am sixty-five. . . I don't remember whether there was a plat attached to the deed or not."
The plaintiff, being recalled, further testified, that on the night before the deal was closed C. C. Merritt, another son-in-law of the defendant, referred to previously by the plaintiff merely as Mr. Merritt, came to his home and stated "that Mr. Miller sent him out there to know if I was coming down the next morning at eight o'clock, and that he would have the deed fixed. . . He said that Mr. Miller sent those papers, and for me to come down in the morning and give him a check;" also, that he, the plaintiff, could not read without his glasses, and did not have them "at that time."
Mrs. Barnett, the wife of the plaintiff, testified as follows: "I am the wife of R. A. Barnett, the plaintiff in this case. Being his wife and living with him, I saw him and know him more than anybody else, and of course I noticed that his mind was not as good as usual, but I could not tell what it was, and he is not a man that is free to spend, and he is a close man, and he really knows the value of a dollar when he is at himself, and I know in my own mind that he was not himself, because he was free to give people and would go and spend, and that is unusual for him; and in noticing that, I carried him to the doctor. After I found out about this trade, I went to Mrs. Livingston and asked her if she would not *Page 645 
take back the deed and give me the money, and she refused to do so, and I went back the second time, and she refused to do it; and that is all I could do except go to a lawyer. It was possibly a week after November 9, when I went back to Mrs. Livingston. I did not know anything about it until I got the statement from the bank showing that this check was given to her, and it overdrew the account."
The only other evidence as to the plaintiff's mental capacity was as follows:
J. W. Preston testified: "I have known Mr. Barnett about thirty years. In 1939 I would say his mental condition was not normal; he was not what he had been. . . So far as I know, he is normal now. About this time I think he was abnormal."
C. T. Williford testified: "On the night in question Mr. Barnett came over at a barbecue at Mr. West, and asked me to come over to the office to see the records; and I got over here, and he and Mr. Dan Miller wanted me to fill in a deed to property with stable on it. That was nighttime. About nine o'clock." Q. "State [how] he acted?" (speaking of Mr. Barnett). A. "I did not know, but I just thought he had a drink. He was a little off." Q. "Just state the facts, Mr. Williford?" A. "He was a little excited, and it would be drawing my own conclusion. He was a little different from what he had been, and he wanted to pay me for recording the paper, and I told him to pay me the next day."
V. T. Akridge testified: "I remember the night of November 9, the supper was had at Mr. West's store. I saw Mr. Barnett that night before supper. Mr. Barnett did not appear to be normal. The reason I say that is that it was unusual for him to be down town that late, and I was closing my store, and he came by and he said, `Wait, let's get a coca-cola,' and he came up in front, and I said, `All right,' and he said, `Let's see who pays for it,' and he said, `Let's pitch for the crack and see who pays for them,' and he started to throw, and as he did he said, `Let's throw for the fifty cents too,' and he won the fifty cents and the coca-cola too, and as he threw the coin he said,`And see who pays for the supper,' and it was my understanding that the supper was to be free, and I said `You going to the supper?' and he said, `I am going to eat barbecue with old John,' but he acted like a man who had a drink. We went on around and ate barbecue, and some one made the remark *Page 646 
that he was eating barbecue and that he was not supposed to eat it, and then he said, `Let's go,' and I was not through eating, and when I got through I told him I was ready to go, and he said, `No, I got some other business to attend to,' and I did not see him any more that night. I have known Mr. Barnett since 1931."
At this point Mr. Farkas, counsel for the plaintiff, stated: "We admit that he had sufficient mental capacity to make a deed."
W. T. Boatwright testified: "I recall seeing Mr. Barnett about the 8th or 9th of November, 1939. I saw him about every day. I did not notice his condition in particular. The one thing in particular I noticed was one morning he came in and said, `What are you doing back there? doggone your soul,' and somebody came in and called for a piece of meat, and it came to seventy-two cents, and he said, `Cut him off a piece' like that, and he never said or asked me anything about it."
Centennial Kidd testified: "I was at the home of Mr. Barnett on the night of the 8th or 9th of November, 1939. Mr. Barnett, his wife, and daughter-in-law were there. I did not talk to Mr. Barnett, because I did not stay but a few minutes, but when I went in I noticed that something was wrong with him, and he acted peculiar. I did not talk to him. I just spoke to him. He got up out of his chair, and he did not say anything but speak to me, but his face looked different from what he had been looking; it was unusually red. I went on home and told my wife about it."
M. C. Screws testified: "Along last fall, I don't recall the dates, me and some fellows were standing at the well, and I don't recall who they were, and Mr. Barnett walked up there and said, `I want you to get your well machine and clean out this well,' and he said he had the money to pay me. I was digging a well at that time, and said `All right, Mr. Barnett, I will when I get through.' I never heard him make a statement like that before."
Alton Rogers testified: "I know Mr. Barnett. I recall seeing him in my store on or about the 8th or 9th of November, 1939. He fell out like a man that was drunk. That is all I know.
The defendant, Mrs. Livingston, testified: "I have never authorized Dan Miller to negotiate the sale of any of my property as my agent. . . I signed this deed to Mr. Barnett. Mr. Barnett had me to sign the deed. I did not see Mr. Barnett, I never did say anything to him about it; the deed was brought to me, and I *Page 647 
signed it. I don't know who brought the deed to me. Mr. Barnett did not speak to me about the trade. I got the $2500. . . Dan Miller did not bring these deeds to me." Q. "Did Mr. Merritt bring them with these boys that witnessed it?" A. "Yes, sir."
Dan Miller testified: "I did not make any statements to Mr. Barnett in negotiating the sale of this property over here. I did not know it was sold until after it was over."
Among the excerpts from the charge of the court, of which the movant complained, were the following:
Ground 14: "I charge you, gentlemen of the jury, that fraud voids all contracts, and that a promise to do a certain thing for the benefit of the promisee, made to induce him to enter into a contract, or to purchase property, the promisee or purchaser earnestly believing that he would receive the benefits upon the carrying out of the promise by the promisor or seller, when at the time the promisor or seller made the promise there was no intention on his part to fulfill it, but, on the contrary, the promise of the promisor or seller was made with the intention not to carry it out, and was made as a mere scheme or device to defraud the promise or purchaser, is such a fraud that it will void the contract induced thereby, and will authorize a rescission of the contract of purchase and entitle the purchaser to recover the purchase-price for said property."
Ground 15: "I charge you that if you believe, under the rules of law I have given you in charge and will give you in charge, that the plaintiff purchased certain land from the defendant, and that the defendant's agent in negotiating the sale did with the intention to defraud plaintiff represent he was selling the plaintiff certain land including the Mrs. Emma Hudspeth Livingston home place, and did fraudulently omit from the deed to plaintiff the said Mrs. Emma Livingston home place, and that plaintiff, relying upon the representations made by defendant's agent and in the exercise of ordinary care, accepted the deed believing that the same conveyed to him the land including the Mrs. Emma Hudspeth Livingston home place, and paid to the defendant the sum of $2500, and the plaintiff, upon discovering that the deed did not convey the Mrs. Emma Livingston home place, within a reasonable time offered to rescind the contract of purchase and tendered the deed back to the *Page 648 
defendant and offered to reconvey the property, and which defendant declined to accept, then it would be your duty to find that there has been a rescission of the contract of purchase-price paid for said land."
Ground 16: "I charge you that if you believe the defendant, through her agent, in negotiating and selling the land in question represented to the plaintiff that the same included the house and lot known as the Mrs. Emma Hudspeth Livingston home place, and that the deed delivered to plaintiff did not include the said home place, and that by reason of the omission of said home place materially reduced the value of the property plaintiff bought, and that plaintiff was induced to purchase the property by reason of these false and fraudulent statements and representations, and there was no negligence on the part of the plaintiff in discovering said misrepresentations under the rules of law I have given you in charge and will give you in charge, then it would be your duty to find in favor of the plaintiff for a rescission of the contract, which would entitle plaintiff to a refund of the purchase-price paid by him to defendant."
Ground 18: "In this connection I charge you that a failure of the plaintiff to read the deed delivered to him before accepting it does not in itself amount to such an act of negligence as will prevent him from having the sale rescinded and set aside, if you believe under the circumstances in the case the plaintiff exercised ordinary care in accepting the deed."
Ground 19: "Under the law of Georgia a deed is signed by the grantor, and is not required to be signed by the grantee or purchaser. If the grantor or seller promises and agrees to deliver a deed conveying certain and definite real estate according to her oral agreement with the grantee or purchaser, the grantee or purchaser has just expectation that there will be no change from the oral agreement."
Ground 21: "I charge you that if you believe that the plaintiff agreed to purchase and understood that he was purchasing certain land including the Mrs. Emma Hudspeth Livingston home place, although the defendant understood that she was selling certain land not including the Mrs. Emma Hudspeth Livingston home place, and that plaintiff ignorantly and without examination accepted the deed for certain land not including the Mrs. Emma Hudspeth *Page 649 
Livingston home place, without noticing said omission, and you believe that plaintiff exercised reasonable diligence in said transaction, and immediately upon the discovery of the mistake that the Mrs. Emma Hudspeth Livingston home place was not included in the deed he notified defendant and sought to rescind the contract, then it would be your duty to find in favor of the plaintiff for a rescission of the contract."
Ground 22: "I charge you that if you believe that the price paid for the land to defendant by the plaintiff was far below and out of proportion to the market value of its worth, and in addition thereto you believe that there is a great disparity of mental ability between the plaintiff and the defendant's agent, if you believe from the evidence that Dan Miller was the agent of Mrs. Emma Hudspeth Livingston, who negotiated the trade for her, you would be justified in setting aside said sale of the land and restoring to plaintiff the money paid therefor."
Ground 23: "I charge you, gentlemen, that if you believe the plaintiff purchased from the defendant certain real estate including the Mrs. Emma Hudspeth Livingston home house, and through mutual mistake the deed delivered to the plaintiff omitted the Mrs. Emma Hudspeth Livingston home place, then it would be your duty to reform the deed so as to include the Mrs. Emma Hudspeth Livingston home place, in order that the deed may speak the agreement of the parties."
Other pertinent facts are stated in the opinion.
1. Generally the parties will be referred to herein merely as plaintiff and defendant as they appeared in the court below, although they have exchanged positions in this court.
In the state of the record, there is nothing to be reviewed in reference to the demurrers. A general and special demurrer to the petition was overruled, and the defendant excepted pendente lite. Later the petition was amended in material respects. The defendant renewed her original demurrer, and also demurred generally and specially to the petition as amended. The rulings were again adverse to the defendant, but no further exceptions were taken. In the circumstances, the exceptions pendente lite to the first ruling *Page 650 
on demurrer and the assignment of error based on such exceptions present only a moot question. A demurrer to an original petition does not, without more, cover the petition after it has been amended in material respects; but in such case the demurrer should be renewed if it is still relied on. Code, § 81-1312;Powell v. Cheshire, 70 Ga. 357 (2, b) (48 Am. R. 572);Howard v. Allgood, 143 Ga. 550 (1, b) (85 S.E. 757);General Accident, Fire Life Assurance Corporation v. Way,20 Ga. App. 106 (2) (92 S.E. 650); Postal Telegraph CableCo. v. Schaefer Cotton Co., 21 Ga. App. 729 (94 S.E. 910);Smith v. Dalton Ice Co., 45 Ga. App. 447 (165 S.E. 144). While the defendant here did renew her original demurrer, as well as file an entirely new demurrer attacking the petition as amended, these further steps can not aid her in this connection, since she presented no exceptions to the additional adverse rulings. Not only this, but the subsequent rulings, not having been excepted to, became the final law of the case as related to the demurrers; and for this additional reason the exceptions to the original order must be treated as presenting only a moot question. In other words, whatever merit, if any, these exceptions might have had originally, they were superseded by the subsequent proceedings, and a decision thereon would be of no benefit to either party. Accordingly, no decision or ruling will be made on such exceptions. Compare Folsom v. Howell,94 Ga. 112 (21 S.E. 136); Tingle v. Maddox, 186 Ga. 757 (2) (198 S.E. 722); Green v. Spires, 189 Ga. 719, 721
(7 S.E.2d 246); Jones v. Butler, 191 Ga. 126 (12 S.E.2d 326).
Nothing said above is intended to imply that the petition either before or after amendment was in fact subject to demurrer, as contended by the plaintiff in error.
2. In view of what has been said in the preceding division, the petition as amended must be treated as stating a cause of action, and the particular parts of it that were separately challenged by demurrer are to be taken as pertinent and sufficient, as against the attacks made.
This brings us to the question of whether the court erred in refusing a new trial.
In addition to the original briefs filed for the parties respectively and a reply brief for the defendant in error, supplemental briefs were submitted for both the parties in relation to specific questions, suggested by this court. *Page 651 
We have carefully considered all of these briefs and the authorities cited in each, although, in the view which we finally take, it may seem to counsel that our suggestion as to additional briefs was unnecessary. It is the desire of this court, however, to have all the light possible before reaching a conclusion in any case, and it was in this approach that the supplemental briefs were invited.
Regarding the motion for a new trial, we shall deal first with the exceptions to the rulings on admission of evidence, the grounds of the motion being referred to herein according to the numbering in the amendment.
In ground 1 the movant complained of the admission of testimony of the plaintiff that the following statements were made to him by Dan Miller (alleged agent of the defendant): "I want you to furnish the money. I want to go in business with you, and we can make plenty of money. I want to go in business with you. I can make plenty of money for you and me too;" the objection urged at the time being that the evidence related to mere conclusions of Dan Miller, and to representations on his part as to "matters and things to occur in the future." The evidence tended to prove the case as laid, and was not objectionable for any reason stated. Kelly v. Strouse,116 Ga. 872 (2) (43 S.E. 280); Coral Gables Corporation v.Hamilton, 168 Ga. 182 (8) (147 S.E. 494); Cook County v.Thornhill Wagon Co., 189 Ga. 360 (2) (5 S.E.2d 881);Floyd v. Morgan, 62 Ga. App. 711 (5), 715 (9 S.E.2d 717).
The evidence referred to in ground 9 tended also to prove one of the allegations of the petition, and was not inadmissible for the reasons urged. In Kelly v. Strouse, supra, it was stated: "It is not error to refuse to rule out evidence tending to support the allegations of a petition, irrespectively of the question whether the petition is good in substance or not, or whether the evidence when admitted establishes a right to recover."
3. In ground 2 it was insisted that the court erred in admitting the following testimony of a named witness for the plaintiff, in reference to the plaintiff's mental condition: "In 1939, I would say he was not normal, he was not what he had been. About this time I think he was abnormal." The witness gave no facts as basis for this statement, except that he had known Mr. Barnett for about thirty years. The evidence was objected to as being a mere conclusion *Page 652 
of the witness. Manifestly it was a conclusion only, and the objection should have been sustained, the long acquaintance without more being insufficient as a basis for such conclusion.Welch v. Stipe, 95 Ga. 762 (22 S.E. 670); Credille v.Credille, 131 Ga. 40, 42 (61 S.E. 1042); Jenkins v.Lane, 154 Ga. 454 (5), 479 (115 S.E. 126). Whether this error alone would require a new trial under the whole record is not decided, since, as will be seen later, a new trial must be ordered for other reasons.
The remaining six grounds complaining of the admission of evidence over stated objections do not show error. In each of these grounds it appears that the evidence to which the defendant objected related to the conduct, appearance, or statements of the plaintiff, and were offered for the purpose of showing subnormal mental capacity. In substance, the objections urged were that the evidence was insufficient for the purpose for which it was offered, did not show incapacity to contract, and was irrelevant. Again, it may be said that the evidence was relevant as tending to support some of the allegations of the petition, and was not objectionable for any reason assigned. The mere circumstance that certain evidence may within itself fall short of proving a fact which the party offering it seeks to establish is not a sufficient reason for excluding it. Unless otherwise objectionable, it should be admitted, even though it may onlytend to prove the matter in issue. Causey v. Wiley, 27 Ga. 444;Nugent v. Watkins, 129 Ga. 382 (2) (58 S.E. 888); 22 C. J. 164, § 91; 20 Am. Jur. 245, § 252.
Except as stated above in reference to ground 2, there is no merit in any of the assignments of error relating to the admission of evidence.
4. Of the sixteen grounds of the motion assigning error on the charge of the court, eight are clearly without merit; and only as to the other eight, to wit, grounds 14, 15, 16, 18, 19, 21, 22, 23, do we deem discussion or more particular statement necessary.
In ground 14 the movant complained of the following charge: "I charge you, gentlemen of the jury, that fraud voids all contracts, and that a promise to do a certain thing for the benefit of the promisee, made to induce him to enter into a contract, or to purchase property, the promise or purchaser earnestly believing that he would receive the benefits upon the carrying out of the promise by the promisor or seller, when at the time the promisor or seller *Page 653 
made the promise there was no intention on his part to fulfill it, but, on the contrary, the promise of the promisor or seller was made with the intention not to carry it out, and was made as a mere scheme or device to defraud the promise or purchaser, is such a fraud that it will void the contract induced thereby, and will authorize a rescission of the contract of purchase and entitle the purchaser to recover the purchase-price for said property." This charge was, in effect, assigned as error for the reasons, among others, (1) that in stating that fraud voids all contracts it was too broad as applied to the particular case, in that it contained no exception or qualification as to written contracts, and (2) that it relieved the plaintiff of all duty of diligence to ascertain the terms of the deed or contract under consideration. Both of these exceptions were well taken. InGossett v. Wilder, 46 Ga. App. 651 (7), 653 (168 S.E. 903), the now lamented Judge Guerry, speaking for the Court of Appeals, said: "As a general rule, fraud voids all contracts. This rule is not applied in its entirety and without reservation to written contracts, for the reason that misrepresentations and false statements will not be heard in contradiction of the terms of a valid written instrument, unless it should appear that the party signing the same has been induced to sign by a fraud, trickery, artifice, or emergency, happening at the time of such signing. One about to sign a written instrument can not rely blindly upon the representations of other parties as to its contents, and if, without an emergency or fraud inducing him not to read it, he signs without reading, he can not hold the other party responsible for his statements, though they be false." This was a correct statement of the law, based on previous decisions both by the Court of Appeals and by this court.
The Code declares that if a party, by reasonable diligence, could have had knowledge of the truth, equity will not relieve. § 37-211. Any misrepresentation, act, or artifice intended to deceive, and which does deceive another, is such a fraud as may authorize cancellation of a written contract; but, as this court has often held, a party to a contract who can read must read or show a legal excuse for not doing so, and ordinarily, if fraud is the excuse, it must be such fraud as prevents the party from reading. Weaver v. Roberson, 134 Ga. 149 (67 S.E. 662);Dover v. Burns, 186 Ga. 19 (196 S.E. 785); Lewis v.Foy, 189 Ga. 596 (6 S.E.2d 788). *Page 654 
The rule will generally apply to the grantee as well as the grantor in a deed of conveyance. Sumner v. Sumner, 121 Ga. 1
(5) (48 S.E. 727); Union City Realty Co. v. Wright,138 Ga. 703 (3) (76 S.E. 35); Browning v. Richardson,181 Ga. 413 (182 S.E. 516); Karpas v. Candler, 189 Ga. 711
(7 S.E.2d 243). According to some decisions, it seems that the rule may not apply with the same force to contracts of insurance. Whether this is because agreements of this nature are usually quite lengthy and so involved with exceptions and qualifications that it might be thought even a careful reading by a non-expert would not always disclose their full meaning, or because of the manner in which policies of insurance are customarily handled as between the insured and the insurance agent, or whether there may be some other reason, the present case, relating to a plain and unambiguous deed to land, is controlled by the decisions last above cited, and others like them which might be cited in the same connection. For cases involving insurance contracts, seeCaverly v. Stovall, 134 Ga. 677 (68 S.E. 442); OverlandSouthern Motor Co. v. Maryland Casualty Co., 147 Ga. 63
(92 S.E. 931); Equitable Building Loan Association v. Brady,171 Ga. 576 (156 S.E. 222); Great American Indemnity Co. v.Southern Feed Stores Inc., 184 Ga. 560 (192 S.E. 1).
The plaintiff, the defendant in error here, also relies on the following law: "The negligence of the complaining party, preventing relief in equity, is that want of reasonable prudence, the absence of which would be a violation of legal duty. Relief may be granted even in cases of negligence by the complainant, if it appears that the other party has not been prejudiced thereby." Code, § 37-212. This section is a codification from the decision of this court in Werner v. Rawson, 89 Ga. 619
(15 S.E. 813), which is in like manner cited and relied on by the plaintiff. The Werner case involved mutual mistake, and not fraud, as was charged in the present case in the only count on which the jury made a finding. That the decision in that case and the section of the Code based thereon do not sustain the foregoing portion of the judge's charge should, as we think, become evident, when they are considered in connection with the later decision by this court in Green v. Johnson, 153 Ga. 738
(3) (113 S.E. 402), which also dealt with reformation as a remedy for mutual mistake, and in which certain distinctions were noted as between mutual mistake on the one *Page 655 
hand, and fraud alone or fraud and mistake on the other. In the latter decision, prepared by Mr. Justice Hines, and concurred in by all the Justices, it was said: "This court has held that where two contracting parties deal with each other at arm's length and on equal terms, and where there is no such confidential relation between them as to justify special confidence reposed by one in the other, a written instrument entered into between them can not be set aside upon the ground that the party seeking to be relieved was induced to enter in and sign the instrument in consequence of fraudulent representations as to its contents upon the part of the adverse party, when it appears that the party signing could read, that there was nothing to prevent him from reading the instrument, but that he did not do so, that there was no sufficient excuse for his failing to do so, but he signed after he had full opportunity to inform himself as to the terms of the instrument by reading it, but negligently omitted to read the same, when he could thus have informed himself of its contents. [Citations.]
"This doctrine has likewise been applied by this court to actions for reformation of instruments. On this subject this court has said: `Equity will not reform a written contract because of mistake as to the contents of the writing on the part of the complaining party (who was able to read), and fraud of the other party which consists only in making false representations as to such contents on which the complaining party relied as true because of confidence in the party making them; no fiduciary or confidential relation existing between the parties, and no sufficient excuse appearing why the complaining party did not read the contract.' Weaver v. Roberson [supra]. The above doctrine does not apply if the party seeking relief shows some good excuse for not reading the instrument. [Citations.]
"We do not think that this principle should be extended to cases in which it is sought to reform written instruments on the ground of mutual mistake of fact. It has been proclaimed and applied by this court only in cases where parties have sought to be relieved from their contracts, or have undertaken to have instruments reformed, on account of fraud perpetrated by one of the parties on the other."
While the Werner case was not among the cases cited in that decision, it is clear, from that and the other adjudications, that the decision in the Werner case has never been taken to mean that a *Page 656 
party may be excused from reading a contract as plain and simple as an ordinary deed, merely because of a false and fraudulent statement regarding its contents. Nor does the decision inKuniansky Inc. v. Ware, 192 Ga. 488 (15 S.E.2d 783), have any such meaning; and the same is true of Hamlin v.Johns, 166 Ga. 880 (144 S.E. 659). Compare Jossey v.Georgia Southern Florida Railway Co., 109 Ga. 439, 447
(34 S.E. 664), distinguishing the Werner case.
While the petition in the instant case, which as stated above is to be treated as good against demurrer, alleged nothing directly as to diligence, this did not prevent the defendant from asserting negligence as a defense; and for this purpose she could rely solely on the plaintiff's evidence, provided the issue was affirmatively presented thereby. Evans v. Josephine Mills,119 Ga. 448 (2) (46 S.E. 674). The evidence for the plaintiff did not demand a finding that his mental condition was such as to excuse him, and would have authorized the inference that his failure to read the deed and thus inform himself as to its contents amounted to negligence and to such negligence as would bar relief in equity. This conclusion accords with decisions inWood v. Cincinnati Safe Lock Co., 96 Ga. 120
(22 S.E. 909), McBride v. Macon Telegraph Publishing Co., 102 Ga. 422
(2) (30 S.E. 999), and similar cases, involving artifice to prevent reading. The charge here under consideration wholly ignored the issue as to negligence, and was erroneous as contended. It appears to have been based on division 8 of the syllabus in Coral Gables Corporation v. Hamilton, 168 Ga. 182
(147 S.E. 494); but, as we have said before several times, languages used by the Supreme Court in deciding a case may be inappropriate for use by the trial judge in charging a jury.Atlanta West Point Railroad Co. v. Hudson, 123 Ga. 108
(2) (51 S.E. 29); Macon Railway Light Co. v. Vining,123 Ga. 770 (2) (51 S.E. 719); Smith v. State, 179 Ga. 791,793 (177 S.E. 711). In the Coral Gables case, the court was considering a petition and a demurrer, and the decision was manifestly not intended to rule out negligence as a possible defense.
Upon a strict grammatical construction of the instant charge, it may not have assumed the existence of any fact in issue, but its phraseology is such that it may have been so construed by the jury, especially as to reliance, and it might also have been argumentative *Page 657 
in some respects. The assignments of error do not clearly attack the charge on these grounds, at least not at any vulnerable point; and hence what is said in this connection is not decisive, but is intended to be cautionary and suggestive only.
In view of the preceding discussion, we do not deem it necessary to quote in this connection all of the charges which we have determined were erroneous, as insisted. They are shown in the statement preceding this opinion. The charges complained of in ground 15 did refer to ordinary care, but the language was such that the jury might have understood it to mean that mere fraudulent representations as to the contents of the instrument and reliance thereon by the plaintiff would place him in the position of exercising such care. This was error, in view of the particular facts of the case, as shown by the record. The same comment will apply in principle to the excerpts assigned as error in grounds 16 and 18. If the correctness of the construction we have placed upon these three charges were not otherwise clear, it would be made so by the following additional charge to which the movant excepted in ground 19: "Under the law of Georgia a deed is signed by the grantor, and is not required to be signed by the grantee or purchaser. If the grantor or seller promises and agrees to deliver a deed conveying certain and definite real estate according to her oral agreement with the grantee or purchaser, the grantee or purchaser has just expectation that there will be no change from the oral agreement." This charge tended to exclude all duty or diligence on the part of the plaintiff to examine the deed as offered to him, and was erroneous, as contended, under the principles above enunciated.
5. In ground 21 it was contended that the court erred in giving a stated charge on mutual mistake and rescission. This charge is quoted in full in the statement of facts preceding this opinion. Such charge was erroneous, as insisted, in that it submitted a theory not supported by evidence, to wit, mutual mistake; and it was apparently harmful, as the jury found in the plaintiff's favor for rescission.
6. In ground 23 the movant complained of an instruction onreformation for mutual mistake. As stated in division 5 above, no issue as to mutual mistake was presented by the evidence, and therefore the charge was subject to the exception taken on this *Page 658 
ground. It might have been harmless, however, as the jury made no finding on the second count, which alone sought the relief of reformation.
7. It is declared in the Code, § 37-710, that "Great inadequacy of consideration, joined with great disparity of mental ability in contracting a bargain, may justify equity in setting aside a sale or other contract." A charge evidently intended as an expression of this principle was assigned as error in ground 22. We have carefully examined the criticisms contained in this ground, and regard each of them as without merit. There was no exception on the ground that the charge as given did not employ the phrase "great inadequacy of consideration," as it appears in the Code, but submitted instead whether the price was "was far below[?] and out of proportion to the market value." Hence the correctness of the charge in this respect is not determined.
The special grounds of the motion for a new trial which are not discussed in this opinion are deemed without merit, under the assignments of error made.
As the judgment must be reversed upon other grounds, no ruling will be made upon the general grounds, as to the sufficiency of the evidence to support the verdict.
The defendant in error requested that a decision of this case be withheld pending final determination of a case subsequently arising in the court below, between the same parties, and involving the correctness of the entry of service as made by the sheriff on the bill of exceptions. Without intending to create a precedent, we have delayed decision for some time; but in view of the time limit on our jurisdiction (Code, § 2-3006; Ga. L. 1935, p. 162), we think it proper to dispose of the case at this time. See, in this connection, Cooper v. Nisbet, 118 Ga. 872
(45 S.E. 692); Cooper v. Lazarus, 119 Ga. 970 (47 S.E. 500). If the entry be incorrect and should result in damage, the defendant in error will not be remediless.
For the reasons stated in divisions 4 and 5, the judge erred in refusing a new trial.
Judgment reversed. All the Justices concur. *Page 659