22057. LESTER v. COPELAND et al.

22058. JACKSON, Executrix v. COPELAND et al.

ARGUED JUNE 10, 1963—DECIDED JULY 12, 1963—
REHEARING DENIED JULY 23, 1963.

*Edwards, Bentley & Awtrey, A. Sidney Parker, Scott S. Edwards, Jr.*, for Lester.

*Lawrence B. Custer, Reed, Ingram, Flournoy & Custer*, for Copeland.

*Jean E. Johnson*, for Jackson.

HEAD, Presiding Justice. Millard Copeland, Jr., filed a petition against Mary Jackson, as executrix of the will of Janie Copeland, deceased, and Bannie Mae Lester, a devisee under the will, seeking specific performance of an alleged contract to make a will

devising to the petitioner all of the property of the deceased. On the former appearance of the case in this court it was held that the petition did not state a cause of action, and the judgment of the trial court overruling the general demurrers to the petition was reversed. *Jackson v. Copeland*, 217 Ga. 420 (122 SE2d 573).

Before the remittitur of this court was made the judgment of the trial court an amendment was filed to the petition. Thereafter the defendants renewed their general demurrers, and these renewed general demurrers were overruled. The case proceeded to trial, and the jury returned a verdict for the petitioner. Separate writs of error were filed by the defendants, and these will be considered together.

■ The writs of error recite that after the overruling of their renewed demurrers another amendment was filed to the petition, which was allowed and ordered filed. It is conceded by counsel for the defendants that if this last amendment was a material amendment, the exception to the overruling of the renewed demurrers filed prior to the last amendment would present no question for decision by this court. *Livingston v. Barnett*, 193 Ga. 640 (1) (19 SE2d 385); *Atlantic Refining Co. v. Spears*, 211 Ga. 787 (1) (89 SE2d 177); *Hunter v. Ogletree*, 212 Ga. 38 (89 SE2d 891); *Mack v. Mack*, 213 Ga. 649 (100 SE2d 732); *Whitley v. Williams*, 215 Ga. 1 (2) (108 SE2d 864); *Bryant v. Haygood*, 216 Ga. 561 (1) (118 SE2d 469). After an examination of the last amendment we have concluded that it was a material amendment, and the petition will be treated as not demurred to. *Southern Bell Tel. &c. Co. v. Brackin*, 215 Ga. 225 (2) (109 SE2d 782).

■ At the conclusion of the trial the defendants made a motion for directed verdict. The trial judge denied this motion, and the jury returned a verdict for the petitioner. The defendants filed motions for judgment notwithstanding the verdict and motions for a new trial. The trial judge granted the motions for new trial but denied the motions for judgment notwithstanding the verdict. The defendants excepted to the denial of their motions for judgment notwithstanding the verdict.

The original petition alleged the following contract between the petitioner and Janie Copeland: "That said decedent Janie Copeland orally agreed with petitioner in August of 1960 that in

consideration of petitioner and his wife moving in with her and living with and taking care of her until her death, that all of her property, both real and personal, was to be willed to your petitioner at her death, including the house and 20 acres on which it is located and all furnishings and utensils therein, together with any monies and other property owned by said decedent Janie Copeland at her death."

By amendment the following allegations were made in paragraph 16: "Petitioner shows that as a part of his said agreement with Janie Copeland he agreed that in taking care of her, he and his wife would continuously attend her personal needs by waiting on her, giving her personal nursing care by keeping the home in a clean and orderly manner, by furnishing the necessities of life for her such as food and other material requirements, and by providing her with companionship and affection until her death."

Claudia Copeland, wife of the petitioner, testified in regard to the making of the contract and its performance as follows: "Janie died March 17, 1961. Before her death my husband and I had been living there with Janie since sometime in August of '60. After her husband died she had no one to live with her and so she asked my husband and I to live in with her. . . As to your question, did I hear the conversation between Janie Copeland and my husband, well, quite times she'd call me and I'd go in the conversation. It concerned our living with Janie. In a way when she called me to set with them, she says to me, she says, 'I have done had my agreement with Junior here,' Junior is Millard, I said, 'What is it?', well, she began to tell me. She says, 'I have made agreement with Junior, . . . if you all want to move in the house with me until my death.' I says, 'Well . . . it is all right with me. Of course, you know, I have to go wherever he goes.' Well, she told me, she says, 'Well, that is what I want you all to do; I want you to move on down there with me; be there with me; stay by me; do what is to be done and I will have somebody in the house with me that I can depend on.' And I told her, 'Well . . . where is my part, now, Janie, I will do the best I can about it?' And she says, 'Well, now, at the end of my death, if you all be the longest left . . . . whatsoever . . . is there . . . is you all's at

the end of my death.' I believe that is all Janie said to me that covered an agreement with my husband. . . After this agreement was made between Janie and my husband, Millard, we moved in with Janie. After we moved in I done most all the cooking, you might say, when I was at home. Of course I worked and I cooked and, of course, Junior, he kept wood, coal, he rebuilt the porch, he fixed floors, just what needed to be done around the house and what a man could do, you know, around the house and, quite naturally, he was just pittling most all the time. Janie's health, as to whether or not she was feeble or not feeble, wasn't too good. Sometimes she would require some nursing, some personal looking after, not too often; well, I think about one time she was real sick. I came home from work and looked after her then. Millard would farm there on her property, kind of half way, whatever you call farming the first year around there. For heat we had coal and wood in the house. The wood come from the woods and the coal come from the coal yard and Junior, Millard, would get it. When I would go in home on Friday evening I'd buy the food and bring it with me. At the time we moved in there the house was not wired for electricity but it was done by Millard. I don't know who he saw about the electricity but I do know that he did get it done. . . Millard paid the bills. . . She [Janie Copeland] and I, as long as she was able, kept the premises, the house, clean and straightened up. As to cleaning the house, the mopping and all concerned, I did all that. . . I suppose it is true that Janie had her own money. . . . If she wanted something and if she went to the grocery store and bought groceries, it was a mighty few times. She'd probably go get her a chicken and a loaf of bread but she did not do that very much. . . I mostly work six days a week from 6 in the morning until 4:30 in the afternoon but not on Saturdays, sometimes it is around 8 or 9 o'clock when I get in on Saturday. Janie had a heart condition. . . She bought her own medicine. Janie never was an invalid. Up to the day she died Janie hadn't felt good in a week or two. When Janie died she died in the Town of Austell. . . In the final discussion she said, . . . 'I want you all to move down there with me, . . . I have got to have somebody in the house with me and . . . you all

come on and move down there with me and . . . take care of everything that is there; there is a little repairing got to be done, you knows that, and . . . at my death . . . everything will be you all's.' . . We promised to do the following as is stated in Paragraph 16 of the petition: [The allegations of paragraphs 16 of the amendment to the petition heretofore set out.] and I feel like we did that. I worked and I wasn't there for some five or six or seven hours a day. My husband was there the biggest portion of the time. . . I did some of the things stated in the petition and some of them I didn't. As to what I did, well, personal clothing part, she looked after her own clothing until washing and we would wash. Sometimes she would help me wash and then again she wouldn't. And then, as far as the food part, well, I did all of that. . ."

Millard Copeland, Sr., the father of the petitioner, testified in regard to the contract as follows: "I was present when my boy . . . and Janie had a conversation about my boy coming down there to live with her. They made an agreement about it. . . . She was there at his home at that particular time and she was wanting someone to stay with her to help her out, and she made an agreement with him for him to come and live with her to protect, for protection. Janie told him if he would come and live with her, if she was the shortest liver that he would redeem what she left; yes, he would redeem. Janie told him if he'd come and take care of her as long as she lived, if she was the shortest liver, that she would leave everything up to him. . . After Millard made this agreement with Janie he got fire fuel. I went over to sister Janie's after Millard moved over there and I saw Millard over there doing things; he helped me to haul wood up there for winter and summer purposes, helped cut the wood. He patched around up there and worked around on the floors and different places there where it was needed. He was still there on the day that Janie died. . ."

Filmore Smith, a former employer of the petitioner, testified in part: "I have had several conversations with Janie Copeland during her life time and on two of those occasions they concerned Millard Copeland. The first occasion was on a Sunday after Junior moved there on Saturday. . . He had worked for me

and he had a good convenient place to live, I mean, he could get to his work, back and forth, so, when I got down there it was a rough road and inconvenient and I asked her why he moved there. She told me, "The reason I suppose is that I promised him if he would move here and look after me and this place, as long as I lived that whatever I had at my death would be his; if I should outlive him.' . . . I had another conversation with her . . . within thirty days of her death. . . I took him home one afternoon and I wanted . . . an antique dining room suit she had, and I told her I would build her some cabinets for it and she said, 'You will never get this from me, . . . at my death you might get it from Junior because everything I own when I am gone will be his.' . . . I saw him do these repairs there on the place. I saw him repair the porch. . ."

In determining whether the trial judge erred in denying a motion for judgment notwithstanding the verdict, this court must use the record as it existed at the close of the trial, and may not eliminate any evidence having probative value on the ground that it was improperly received at the trial, and then dispose of the case on the basis of the diminished record. *DeLoach v. Myers,* 215 Ga. 255 (109 SE2d 777); *Wooten v. Life Ins. Co. of Ga.,* 93 Ga. App. 665, 670 (92 SE2d 567).

There was testimony for the petitioner in regard to a contract between the petitioner and Janie Copeland. Most of this testimony did not conform to the terms of the contract alleged in the petition as amended. The petitioner's wife, while under cross examination by counsel for the defendant Bannie Mae Lester, testified that she and the petitioner promised to do the things for Janie Copeland as alleged in paragraph 16 of the petition. A party's pleadings are not ordinarily evidence in his favor. *Patrick v. Holliday,* 200 Ga. 259 (36 SE2d 769). This testimony, however, not being offered by the petitioner, but being elicited on cross examination, apparently by the reading of the paragraph of the petition to the witness and her assent that she and her husband had made the contract therein alleged, was some evidence that the contract had been made as alleged, and a finding was not demanded that the evidence was insufficient to prove the making of the contract alleged.

"A party seeking specific performance of a contract must show substantial compliance with his part of the agreement; otherwise he is not entitled to a decree." *Lee v. Lee,* 191 Ga. 728 (13 SE2d 774) ; *Fambrough v. Fambrough,* 210 Ga. 87 (78 SE2d 14). The petition as amended alleged a contract wherein a near relative agrees to move to the home of the person contracting to devise property, "agreeing to nurse and to give to such person personal, affectionate, and considerate attention, such as could not readily be procured elsewhere, and where the value of such services could not be readily computed in money." *Potts v. Mathis,* 149 Ga. 367, 370 (100 SE 110). Such a contract is an exception to the general rule that where a contract is sought to be enforced which is based on an oral agreement to convey or devise land in consideration of the performance of ordinary personal services, the value of the services must be alleged and proved. *Treadwell v. Treadwell,* 216 Ga. 156 (115 SE2d 535).

The evidence relating to the performance of the contract wholly failed to show that the petitioner and his wife gave to Janie Copeland nursing care and other personal, affectionate, and considerate attention not readily procured elsewhere. Since the evidence demanded a verdict for the defendants because of a failure to show substantial compliance with the alleged contract, the trial judge erred in refusing to grant the motions for judgment notwithstanding the verdict.

*Judgments reversed. All the Justices concur.*