[Crim. No. 4812. In Bank. Jan. 25, 1949.]

THE PEOPLE, Respondent, v. EWELL LEE DANIELLY, Appellant.

Ernest Spagnoli for Appellant.

Fred N. Howser, Attorney General, David K. Lener, Deputy Attorney General, Edmund G. Brown, District Attorney, and Vincent J. Mullins, Assistant District Attorney, for Respondent.

SCHAUER, J.—Defendant was charged with the murder of his wife and with assault upon his wife's friend, Mrs. Elva Sam, with intent to commit murder. To each charge he pleaded not guilty and not guilty by reason of insanity. Upon trial of the general issue a jury found that he was guilty of each offense and that the murder was of the first degree. The verdict upon the murder count was silent as to penalty. The issue raised by defendant's plea of not guilty by reason of insanity was tried before the same jury which had tried the general issue; such jury disagreed and was discharged. Another jury was selected; the issue of defendant's sanity was retried; and the jury found that defendant was sane at the time of the commission of the offenses. Defendant appeals from the ensuing judgments, which impose, respectively, sentences of the death penalty and imprisonment for the term prescribed by law, and from an order denying defendant a new trial. His principal contention is that the trial court erred to his prejudice in refusing to admit, on the trial of his plea of not guilty, evidence which, he asserts, would have tended to establish that he acted in a "heat of passion" and, hence, to show lack of deliberation and premeditation and malice aforethought, essential elements of the crimes of which he was convicted. As is hereinafter shown, the exclusion of such evidence as was offered and rejected was proper because, although the proof of malice aforethought and deliberation and premeditation was, of course, an essential part of the prosecution's case, the rejected evidence was not materially relevant to any theory of defense raised upon the trial of the general issue. Its irrelevancy is made particularly apparent by defendant's own testimony. No claim of prejudicial error is directed at the trial on the plea of not guilty by reason of insanity.

To answer satisfactorily the contentions which have been made in this court it is necessary to relate some history of the persons involved and their relationship, and to quote, at a proper place, substantially in full the offers of proof which were rejected. Defendant and deceased intermarried in January, 1944, and separated in September, 1945. In Feb-

ruary, 1946, in San Francisco, Mrs. Danielly, who was possessed of substantial separate property, including the building in which she resided, obtained an interlocutory decree of divorce, together with a restraining order requiring Mr. Danielly to remain away from her home. Shortly thereafter, Mrs. Danielly went to New York. In May, 1946, while Mrs. Danielly was in New York, Danielly went to her San Francisco home and, according to the testimony of Miss Leola Palmer, who resided there, "Mr. Danielly asked me did I get any letters from Mrs. Danielly . . . And I said no I didn't. So he said, 'Somebody in the house is lying.' So I say, 'Why don't you write to her yourself?' So he said that he was going to get everybody who were in the divorce case and those that had something to do with taking care of the house, for her to go away." Miss Palmer testified, further, that upon another occasion (the date does not appear) while she was living in Mrs. Danielly's home, "Mrs. Danielly and Mr. Danielly were in a fight. So she went upstairs in her mother's room. So he demanded that she open the door, and he told her that 'Open the door, I will kill you at your dead mother's door.' So Mrs. Danielly say, 'All right, Danielly.' He demanded her to go downstairs. She said, 'All right, Danielly, I will go.' So I don't know anything else."

After the entry of the interlocutory decree and the restraining order, defendant and his wife from time to time discussed the possibility of a reconciliation. There is testimony that four or five days before the date of the crimes (October 13, 1946), they told a mutual friend that they had "made up with each other and [were] going back to live with each other as man and wife," that they had "decided to try it over again." According to another witness, however, "They talked about it, but I don't think anything was settled . . . I know he talked to her about it . . . Well, she never did said, 'Yes,' that I heard, and she didn't said 'No.' "

Shortly before 6 p.m. on October 12, 1946, defendant returned from his place of work (Letterman Hospital, where he was a dietetic cook) to the house where he roomed. He telephoned Mrs. Danielly and they had a conversation which he described as follows: "How you doing and so forth. I call her every day . . . We talked in general as we usually do . . . The exact words I can't recall." Then, according to defendant's testimony, he took a bath and soon after 6 p.m. went to bed and remained there until early (fixed by

other witnesses as about 1 or 1:30) on the morning of the 13th, when the police awakened him and accused him of the killing of his wife and the wounding of Mrs. Sam.

At about 11 p. m. on the night of the homicide two men, Earl and Harmon, called upon Mrs. Danielly at her home. Mrs. Sam and other guests were present. These men had known Mrs. Danielly in 1942, when the three worked in the same shop, and had not seen her after that time until the night she was killed. At about 12:30 a. m. on October 13, 1946, Mrs. Danielly, Mrs. Sam, Earl and Harmon left Mrs. Danielly's home to go to a restaurant. As they reached the sidewalk defendant, with a pistol in his hand, came across the street from his parked car. Mrs. Danielly got into Earl's automobile, which was parked before her home. Defendant pointed the gun at Earl, "shoved him," and said, "You fellows have gone far enough." Then, still displaying the gun, defendant walked to Harmon and said, "What are you going to do about it?" Harmon replied, "Nothing. I don't know what you are talking about." Earl and Harmon then "ran off to see if we could find police or something." When Earl and Harmon had run about a block they heard several shots.

After Earl and Harmon "ran off," defendant closely approached the car in which Mrs. Danielly sat and said, "I told you I was going to do this." She replied, "Yes." He shot her through the head; "her head dropped"; he fired three more shots at her. Then he went to the front of the automobile, where Mrs. Sam was standing, and said, "That goes for you too." He shot Mrs. Sam once and she fell to the sidewalk. He fired two more shots at her. In the words of the witness Hamer, a taxi driver who saw the shooting from a distance of about 50 feet, "Well, this man [identified by other witnesses as defendant] fired the shots [at Mrs. Danielly]. After I looked up I heard him say, 'God damn woman,' and something else I couldn't catch, and then he walked around to the sidewalk side of the car and there was a woman [Mrs. Sam] standing there right beside the car and I heard her say something, it sounded like, 'Please don't kill me, I don't want to die,' or something like that, and then he shot at her, and she fell down, and he shot twice more at her after she fell down . . . [Defendant then] walked back around the car . . . He went diagonally across the street to the opposite corner from where I was . . . Then he stopped there . . . and with his gun in his hand he waved to a couple

of cars to go on . . . He told them to move on. They had stopped, they heard the shooting. Told them to move along . . . Then he turned and walked down Webster Street . . . Towards Bush . . . It is over a hill there . . . I got back into my cab then and started up and drove slowly down Webster, to see if I could see where he went. But he had already disappeared . . . I would say it was about 30 seconds, just long enough for him to get out of sight over the hill.''

As indicated above, the police found defendant in his bed at his rooming house about one hour later. He denied positively that he had left his bed during the course of the evening. However, according to one of the arresting officers, ''the bed was found to be of just normal temperature, it was not warm as if somebody had slept in it for any period of time, the bed was cool under the covers. Danielly was in his shirt and his shorts, he did not have anything else on. He appeared to be in a condition that he had not been retiring for any length of time, if he had been retired.'' Defendant's automobile was found parked across the street from the home of his deceased wife, and the only keys to it were found in defendant's room. The pistol was not found.

Shortly after his arrest defendant was questioned by the police and gave answers as follows:

''Q. Did you ever threaten to kill her [Mrs. Danielly]? A. They said I did when we went to [the divorce] trial.

''Q. Who said it? A. Some of the neighbors in the house.

.     .     .     .     .     .     .     .     .

''Q. Didn't you tell anyone you were going to kill her? A. I am very nervous, extremely nervous. In my moments of anger I might say anything. I don't say I did make the statement but I might have. I remain neutral.

''Q. Would you say the possibility is more likely that you did than you didn't? A. I would say comme ci comme ca as the French would say. Fifty fifty.

''Q. When do you think you would have said it? A. Well, we had several brushes there. I can't recall the exact dates . . . I would say it was before [Mrs. Danielly's trip to New York].''

Defendant testified that his relations with his wife were friendly ''since October 1, 1946, to and including October 12, 1946.'' He testified that he returned to his room at about 6 p. m. on the 12th, bathed, ''read a magazine in bed, and I went to sleep. The next thing I knew is the Police Department came barging in.'' He described in detail the circum-

stances of his arrest. According to his testimony, ''I wasn't awakened until I heard the noise, the banging on the door and the landlady told me to open the door. She didn't say what for. And when I got up to open the door the officers hit the door and knocked me back, and he came in with his gun in his hand, and Inspector Ahern came in behind him. And there was about three or four other police officers came in with him, altogether about five. The impact of the door pushed me back into the center of the room. I threw up my hands when I saw the gun. It was quite a shock to me. I didn't realize what was going on. Officer Ahern came in and put the cuffs on me, and left an officer he referred to as Ed—left him to stand guard over me while he went out in the hall checking around. I still didn't know what they were looking for. I learned that from the officer named Ed. He asked me where the gun was. I told him I didn't have any gun, I didn't know what he was talking about. So he used different methods to try to persuade me to tell him where the gun was, which wasn't in existence, I did not own a gun. In the meantime this officer that had on a uniform, while Inspector Ahern was putting the cuffs on me, he tore all the covers off the bed, turned the mattress over, and was patting the mattress looking for a gun, which he didn't find. And there was two others helping him search. One went through the window out on the roof.

''In the meantime Inspector Ahern, I could hear him and the landlady talking outside in the hall. They had gone downstairs and back upstairs, out in the rear of the house, and they finally came back around there, asking me—Then this officer Ed accused me of killing my wife. He said she was deader than a doornail, and there was another woman had been shot and she was at the point of death in the hospital. Of course I told him I didn't know what he was talking about. So he looked around, they wrecked the room,—about three minutes after they got inside of the room it looked like a typhoon had hit it. So this officer removed the cuffs and permitted me to put on some clothing. After being around about an hour or an hour and a half they took me up to 2208 Pine Street [Mrs. Danielly's house] . . .

''Q. . . . What took place there as far as you can remember it, at 2208 Pine Street, on the early morning of October 13, after you were taken up there from your room? A. Well, the Inspector, he yelled upstairs to somebody, I don't know who he was talking to, he said 'Is this the man you saw with the

gun?' He said 'Yes.' In the meantime Inspector Ahern went upstairs, and he . . . met the District Attorney on the stairs, and he came downstairs. And that is where I first met this secretary that took down the notes what was being said.

"Q. And thereafter they took you over to the hospital, is that right? A. That is right . . .

"Q. And confronted you with Elva Sam? A. Yes . . . [W]hen we entered the hospital Inspector Ahern took me into the room where she was, and she was laying there, seemed to be under the influence of narcotics—that I don't know—called her, he said 'Mrs. Sams, this is the husband. Is this the man that shot you?' And she barely opened her lids, raised her eyelids, and said 'Yes.' . . . She was laying on the table like this (indicating) and I was standing off to the right, and after he called her a couple of times she opened her lids like that (indicating), she say 'yes' and mumbled something that was incoherent, to the effect that 'I don't know why he shot me.' . . . Immediately after she . . . accused me of the shooting, they took me out of the room. And as we got outside in the corridor I immediately denied it. Of course I didn't want to make any noise there in the room where the woman was supposed to be at the point of death . . . I said 'That woman is out of her head, she is under the influence of narcotics, and she doesn't know what she is saying.' I said, 'In other words I am perfectly sober and that woman is dizzy, you say she is at the point of death, whose word are you going to take, hers or mine?' "

It is to be noted that the fine detailing of events as above narrated beginning when the police "came barging in" to his room about 1:30 a. m. on October 13, is the testimony of the defendant who, it is now urged, has absolutely no memory of, and never was conscious of, any events or acts during some six to eight hours immediately preceding such "barging in" of the police.

Defendant testified that he did not recall going into the Bee Hills' Tavern, near the house in which he lived, on the night of October 12. However, an acquaintance of defendant testified, for the defense, that he saw defendant in the tavern at about 8 p. m. on the night of the 12th; that "I asked Danny, was he going to play poker that particular night. And I don't think—he must of didn't hear me, or something, because he never give me any kind of answer. So I asked him again. And he said, 'No, no,' he said, 'I am not playing tonight'; he said he had some business to attend to.

So then I turned to the bar to get me a beer, and I turned around and Danny was gone . . . [H]e act stranger than he acted before to me, because Danny was generally a fellow if you would ask a question, he would answer it. But I asked him about playing poker, and he looked at me, but he never answered me. And I asked him the second time, and he just— I don't know, he talked like he might have been worried or something . . . [H]e wasn't drunk . . . [H]e acted more or less like he might be in a daze, or something, from the way he answered my question.''

Defendant testified, further, and positively, that he did not kill his wife, did not shoot Mrs. Sam, did not drive to the house of his wife on October 12, and did not have a gun in his possession on that night. His testimony in this respect is in material part as follows:

''Q. Did you kill your wife? A. No.

''Q. Did you shoot Elva Sam? A. No, I did not.

''Q. Do you know how your car was placed on Pine Street opposite 2208 Pine Street? A. No, I do not . . .

''Q. Did you drive it out there that you know of? A. No, not that I know of, no. In fact, I know I didn't. . . .

''Q.. Did you own or possess any firearms, any pistol . . . on October 12, 1946? A. No.

''Q. Did you have any in your custody or under your control? A. No.''

And on cross-examination, defendant testified,

''Q. You do recall absolutely you did not go out of the house after you arrived home that night? A. I stated I did not, because I don't remember going out. However other people testified I did . . .

''Q. Isn't it true on that night you had a light grey gabardine coat, a hat, and were wearing glasses? A. No, it is not a fact I wore any gabardine coat that night until the detective told me to get dressed about 1:30 when he got me out of bed.

''Q. . . . [You] drove to 2208 Pine Street? . . . A. No, I did not. I don't recall even leaving the house. I stated that before . . .

''Q. Didn't you park your car across from 2208 Pine Street and wait for your wife to come out of the house? A. No, I didn't, for the simple reason I didn't know my wife was coming out of the house.

''Q. And when your wife and Elva Sam and Sydney Harmon and Jack Earl came down the steps, didn't you get

out of your car and walk across the street with a gun in your hand? A. No, I didn't . . .

"Q. Didn't you then point the gun at Jack Earl and say 'This has gone far enough?' A. No sir, I did not. I didn't have a gun.

"Q. Didn't you then force Jack Earl around the side of the car around to the sidewalk where Sydney Harmon was standing? A. No sir, I did not. I have never seen Jack Earl before until I was brought to the Coroner's inquest . . .

"Q. Isn't it a fact, after you moved Sydney Harmon and Jack Earl around to the sidewalk, you then walked out on the street side of the automobile, pointed the gun at your wife's head, and said 'I told you I was going to do this'? A. No.

"Q. Isn't it a fact you then pulled the trigger and shot her through the head? A. No.

"Q. Isn't it a fact you then fired several shots, several other shots at her as she fell over in the seat, and missed? A. No.

"Q. Isn't it a fact you then walked around the street to the sidewalk where Elva Sam was, and said 'This goes for you too'? A. No.

"Q. And isn't it a fact that at that time you pointed the gun at her and shot her through the chest? A. No.

"Q. Isn't it a fact as she fell down in the street you pointed the gun at her and fired several more shots? A. No."

It is defendant's position on appeal that at the trial he denied shooting his wife and Mrs. Sam only because he had no recollection of having done so; that he did commit the homicide and the assault (battery) but that the offenses were, at the most, manslaughter and simple battery because at the time of the shootings he acted unconsciously or in a "heat of passion" and without malice aforethought and without a deliberate, premeditated intention to kill. There is no evidence whatsoever that the killing resulted from a sudden quarrel and in the heat of any reasonably aroused passion. The purpose of defendant's own testimony appears to have been a point blank denial of the shootings, and perhaps, also, an attempt to establish that he was not capable of committing a crime because he "committed the act charged without being conscious thereof." (Pen. Code, § 26.) The jury, obviously, did not believe his testimony. Neither did his attorney (at least in respect to his denials of the overt acts), who in final argument said (in referring first to the shooting of Mrs. Sam

and then to the killing of Mrs. Danielly): "I don't claim that she was accidentally shot. There was some mention made around here as to the question of whether or not she was hit by a stray bullet or not, but she testified and I believe that the person who fired that shot fired it directly at her and into her body and, fortunately, however, it went above her heart and the poor girl is alive today even though she might still be suffering with the wound. But who did it? Undoubtedly, ladies and gentlemen of the jury, from the evidence in this case you believe and I believe that Danielly fired that shot. I believe that Danielly fired the shot into his wife's brain the night of October 12, 1946, despite the fact that he took the witness stand and said he did not do it—despite that fact."

Defendant's theory at the trial is expressed by the following language of his attorney in addressing the jury: "Now, we're not here . . . trying to prove an alibi . . . . It's not a murder. They say we didn't prove passion, that he acted in the heat of passion. We don't have to prove anything, ladies and gentlemen of the jury, in defense in any sort of a criminal case, much less then in the trial of a murder case. It's incumbent upon the prosecution . . . to establish each and every essential element of the crime charged in the Information. And one of the most essential elements, if not the only essential element, outside of the unlawful killing, wilful killing is malice aforethought. And have they proved it? They have not. We, on the other hand, have proven in this case, I would say beyond a reasonable doubt and to a moral certainty that Danielly had no malice aforethought against his wife. He had no reason to have any. He killed the object of his affections—that's just what he did—she's gone as the District Attorney states, he's lost her forever. His liberty? Yes, his life is at stake for having done what he did. *When he didn't know it, when he didn't realize what he was doing.* . . . We are relying, however, ladies and gentlemen of the jury for a verdict of manslaughter in view of the fact they have proven an unlawful killing, *they have probably proven a wilful unlawful killing but they have not proven a wilful, unlawful killing with malice aforethought* which reduces it, reduces the homicide, reduces the killing to voluntary manslaughter.

"Voluntary manslaughter may be committed in two ways: In the heat of passion or upon a sudden quarrel. *There is no testimony in this case that there was any sudden quarrel*

unless, perchance when Danielly got home from Letterman Hospital that night, that evening, called his wife on the phone they had a quarrel over the telephone. *There is no reference to that in this case. So we are not relying upon manslaughter and asking for your verdict on the ground that this homicide occurred by reason of the fact that there might have been a sudden quarrel, but it was done in the heat of passion.* Something happened. Something was said. Something had gone through this man's mind since they made up in June back in New York as it was testified to here, and was not disputed. Something happened thereafter to make this man's mind work to get up at 8:00 o'clock at night, if he had gone to bed already, and go up there and fire a bullet into his wife's brain. Something happened that he's not responsible for, *for the reason that he did not know what he was doing.*" (Italics added.)

Again, in his briefs before us, it is argued that "In the absence of being allowed to prove, at the section of the trial on the Not Guilty plea, the defendant's insanity, *it was our contention, and it is still our contention, that the homicide was voluntary manslaughter done in the heat of passion* . . . We did not try to prove insanity at the first phase of the trial as the Attorney General claims we tried to do throughout the trial. We realized we were estopped by the laws of the state and by the rulings of this honorable Court. But aside from proof of mental weakness, we had a right to introduce evidence which would be calculated to dispel malice, premeditation and deliberation, and to show thereby that the defendant was such a man who could act and did act in the heat of passion, and thereby help prove that the homicide was a manslaughter and not a murder. We therefore believe this honorable Court should, in the interests of justice, and in justice to the appellant, now consider the evidence as a whole—the testimony given at both phases of the trial—and determine that the homicide was one of manslaughter, and reduce the judgment of conviction to manslaughter. And even though the evidence as to insanity probably fell short of proving legal insanity. All the evidence at the whole trial should be considered . . . in determining whether or not in the face of all the evidence in the case, the first degree verdict should stand." (Italics added.)

On the trial of the general issue defendant was properly permitted to testify within the scope and to the effect hereinbefore indicated. His counsel also sought at that section

of the trial to show by lay and expert testimony that defendant was "highly unstable, highly emotional," and suffered from a "nervous disability." It is concerning the sustaining of objections to this proffered testimony that the principal argument for reversal is made. Defendant's offers of proof at the trial on the not guilty plea were as follows: "We offer to prove by [the witnesses Sergeant Le Velle and Sergeant Yohe] at this time that he is an intimate acquaintance of the defendant, Ewell Lee Danielly; he observed him frequently, almost daily, I suppose, while he was under his supervision [as a cook, not a patient] at the Letterman Hospital. We offer to prove further by the witness that Danielly was of a temperamental mood, highly unstable, highly emotional ... [T]his does. not go to the question of sanity. I don't intend to go that far with it . . . I would like to state for the purpose of the record why I wish this testimony to go in, *to show that this defendant Danielly was in a heat of passion* . . . All for the purpose of showing his state of mind at that time, *with reference to whether or not he acted in a heat of passion* when he shot and killed his wife, if he did so." (Italics added.) When one Black, a friend of both Mr. and Mrs. Danielly, was on the stand, defendant's counsel made the following statement and offer of proof: "In view of the Court's rulings, of course, I intend to ask this witness, but it is not necessary; some of the same questions I asked the sergeants. But I might renew that *over* [offer] again with this witness, if your Honor please, to show the defendant's state of mind on the 12th of October, 1946, with reference to whether or not there could have existed any malice aforethought in connection with any shooting. THE COURT: Same rulings. If the questions were the same, the rulings would be the same." Again, defendant's counsel said, "we have several other witnesses . . . not only subpoenaed but promised to be down here without subpoena. And they are along the same lines that I asked the two sergeants from Letterman Hospital. So we will just have to do without them, in view of the Court's ruling." Defendant also sought to introduce certain testimony of Dr. M. B. Mooslin, a physician and surgeon in general practice, avowedly to dispel "any malice aforethought." The portion of Dr. Mooslin's examination here material is as follows:

"Q. Now, Doctor Mooslin, did you know the defendant, Ewell Lee Danielly, or do you know him? A. Yes, I know him.

"Q. When did you first meet Danielly, Doctor Mooslin? A. About two years ago. June 15, 1945.

"Q. Was he one of your patients? A. Yes.

"Q. Did you treat him for nervous disability? A. Yes, sir.

"Mr. Mullins [prosecuting attorney]: Just a minute. I object to that on the grounds it is incompetent, irrelevant and immaterial, got nothing to do with any of the issues of this case.

"Mr. Spagnoli [defendant's attorney]: It is for the purpose, if your Honor please, of dispelling any malice aforethought in a murder charge laid in the indictment in this case, and to reduce the homicide, which we claim only amounts to nothing more than manslaughter.

"The Court: The objection will be sustained.

"Mr. Spagnoli: All right.

"Q. How frequently, Doctor Mooslin, have you seen the defendant Danielly in your professional capacity? A. About three times.

"Q. About three times. And have you formed any opinion, Doctor Mooslin, as to his sanity or insanity?

"Mr. Mullins: Just a minute. I object to that, your Honor, please, on the grounds that the Court has admonished counsel time after time, both on the voir dire examination of these veniremen, and throughout the trial, so that there was no question whatsoever about it, that the sanity or insanity of the defendant is no part of the issues of this trial, and I ask he be instructed to desist from further questioning along that line, on that ground.

"The Court: The objection will be sustained.

"Mr. Spagnoli: Q. Doctor Mooslin, without regard to the defendant's sanity or insanity, will you answer this question, whether or not in your opinion the defendant . . . is of a highly emotional character?

"Mr. Mullins: The same objection.

"The Court: Same ruling.

"Mr. Spagnoli: Q. Will you state . . . his condition, without reference now to his sanity or insanity . . .

"Mr. Mullins: . . . I object to it on the same grounds. . . .

"The Court: The objection will be sustained.

"Mr. Spagnoli: Q. Did you prescribe medicine in the course of your professional capacity for the defendant . . .?

"Mr. Mullins: I object on the ground it is incompetent, irrelevant and immaterial . . .

"The Court: The objection will be sustained . . .

"Q. Did you, in the course of your treatment, prescribe medicine which was for nervous disability?

"Mr. Mullins: I object on the same grounds.

"The Court: Same ruling; the objection will be sustained.

"Mr. Spagnoli: In view of the Court's ruling, we have no further questions to ask of Doctor Mooslin."

The asking of questions, unless they disclose the proof expected to be adduced, is not the equivalent of an offer of proof. (*People* v. *Harris* (1914), 169 Cal. 53, 64 [145 P. 520]; *People* v. *Singh* (1920), 182 Cal. 457, 482 [188 P. 987]; *People* v. *Reyes* (1924), 194 Cal. 650, 652 [229 P. 947]; *People* v. *McGann* (1924), 194 Cal. 688, 693 [230 P. 169].)

Particularly it may be observed that the question of Dr. Mooslin as to whether he had formed an opinion concerning the sanity of the defendant should not be considered to amount to an offer of proof of insanity, not only because no such offer was actually made, but also because it appears that when, upon the second stage of the trial, the same witness was asked to give his opinion on that subject he declared that the defendant was sane. The record here, therefore, does not provide a vehicle for the contention that notwithstanding the provisions of sections 1016 and 1026 of the Penal Code it was error to exclude, at the first stage of the trial, evidence tending to show legal insanity. (*Cf., People* v. *Wells, ante,* pp. 330, 356 [202 P.2d 53].) None of the other questions to which objections were sustained can be said to substantially augment the formally stated offers.

From the offers of proof which were made and from any which reasonably can be implied, coupled with the defendant's statements of theory, it appears that the evidence offered and rejected was directed not at corroborating defendant's testimony either that he did not do the shooting or that he acted while unconscious or that at the time of trial he was suffering from amnesia, but was, rather, expressly directed solely to the issue of whether, because he was "highly emotional" and "nervous," he acted in a "heat of passion" and hence, assertedly, without malice aforethought and without premeditation or deliberation, disjoined from any unconscious state and disjoined from any substantial cause for passion. It is obvious that defendant would not be guilty of manslaughter, or of any crime, if in truth he acted while wholly unconscious. (Pen. Code, § 26, subd. 5.) Under such circumstance there would be no question of reducing an offense from murder to manslaughter; there would simply be no crime. As

previously shown, defendant, when under oath as a witness, did not claim that he shot his wife or Mrs. Sam in a fit of passion. Indeed, when he was asked, on cross-examination, the direct question, ''You were not [at the time of the shooting] in any sudden heat of passion, were you?'' his own attorney interposed an objection to the question and prevented its being answered. Defendant denied the shootings altogether, claimed that he loved his wife and was friendly toward Mrs. Sam, and he did not introduce or offer any evidence suggesting the existence of provocation which in law could reduce the killing to manslaughter or negative a finding of deliberation.

Mere unrestrained and unprovoked rage, or a ''heat of passion'' to wreak vengeance, of a legally sane although emotionally unstable or nervous person is no defense to homicide. To reduce a homicide from the class of murder to that of manslaughter the evidence must be such as to reasonably lead the jury ''to believe that the defendant did, or to create a reasonable doubt in their minds as to whether or not he did, commit his offense under a heat of passion . . . [T]his heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances, and . . . consequently, no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man. Thus, no man of extremely violent passion could so justify or excuse himself if the exciting cause be not adequate, nor could an excessively cowardly man justify himself unless the circumstances were such as to arouse the fears of the ordinarily courageous man. Still further, while the conduct of the defendant is to be measured by that of the ordinarily reasonable man placed in identical circumstances . . . the exciting cause must be such as would naturally tend to arouse the passion of the ordinarily reasonable man. But as to the nature of the passion itself, our law leaves that to the jury, under these proper admonitions from the court. For the fundamental of the inquiry is whether or not the defendant's reason was, at the time of his act, so disturbed or obscured by some passion—not necessarily fear and never, of course, the passion for revenge—to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this

passion rather than from judgment.'' (*People* v. *Valentine* (1946), 28 Cal.2d 121, 139 [169 P.2d 1]; *People* v. *Logan* (1917), 175 Cal. 45, 48-49 [164 P. 1121].)

There is nothing in the evidence or in the offers of proof to suggest that in coming to the scene of the crime (from his home on Eddy Street, or from Bee Hills' Tavern near his home, to the place in front of his wife's residence on Pine Street), in bringing with him the weapon which he used, and in forming the intent to kill his wife and Elva Sam, defendant felt or had any substantial reason to feel sudden hot anger toward his wife or Mrs. Sam. Nor does any admitted evidence or rejected offer of proof exculpatorily explain his ridding himself of the gun he had used or his fleeing from the scene and returning to his room and bed. On the contrary the evidence tends exclusively to show either a deliberate and planned homicide or that he acted unconsciously or, perhaps, that at the time of trial he was afflicted with some form of amnesia, which latter state (existing only at the time of trial) would constitute no defense to acts done previously while conscious. The evidence in its material aspects, therefore, may be said to show either that the defendant is guilty as charged or wholly not guilty because he acted while unconscious. (Pen. Code, § 26, subd. 5.)

Defendant claimed to remember working at the hospital on October 12 and going home and to bed; as already related he testified in great detail as to the events at the time of his arrest. By his own account his memory is unimpaired except as to the period of approximately seven or eight hours from the time he retired, if he did retire, until the police arrived to arrest him. His last communication with his wife before the shooting had been a telephone conversation, more than six hours previous to the homicide, which, according to his testimony, he remembered, but which was of such a commonplace nature that he did not recall its details. There is nothing to suggest that thereafter, during his period of asserted mental ''blackout,'' anything occurred which might reasonably have aroused defendant's anger or disturbed his ability to premeditate and deliberate. There is a complete absence of evidence of any objective situation, occurring at or near the time in question, which would furnish any cause, reasonable or otherwise, for defendant, devoid of malice, to react in a ''highly emotional, highly unstable'' manner and on that account leave his bed, take a loaded gun and go to his wife's residence. There was no offer to prove that he was

prone to walk or drive an automobile in his sleep or otherwise to act unconsciously; neither is there any suggestion that the excluded evidence would have tended to prove that defendant at the time of trial was suffering from amnesia. Therefore, it does not appear that the fact of his nervous and unstable condition was materially relevant as tending to support any tenable defense suggested by defendant at the time of the trial of the general issue. Defendant did not even offer to show the nature of his ''nervous disability,'' that it would or could tend to make him act unconsciously, or that such affliction was at all material in resolving the issue as to whether he did form and carry out what appears from the objective facts to have been a deliberate and premeditated killing. The proffered evidence as to defendant's mental state did not, as did the offered evidence in *People* v. *Wells, ante,* p. 330, tend materially to disprove a specific state of mind essential to the commission of the crimes charged. It was, therefore, properly excluded. (*Id.,* p. 350.)

■ At the trial of the issue on the plea of not guilty by reason of insanity evidence was adduced which tended to show that defendant was of ''unsound'' mind. Several lay acquaintances said that they believed him to be insane but no expert witness testified that he was insane. No one testified that he was incapable of understanding the nature of his acts or that he could not appreciate that overt acts of the type here involved were wrong and would subject the perpetrator to punishment; nor was there testimony or offer of proof that he was otherwise unable to deliberate and premeditate his acts, or to feel malice.

The defendant himself testified, in effect, that he had suffered several spells of amnesia; he said that he had been told by friends that they had seen him in places he did not remember having visited and which he would have had no occasion to visit. He persisted in his denials of the shootings and insisted that he did not leave, or at least did not remember leaving, his room after he entered it at approximately 6 p.m. on the night of the crimes until after his arrest early the following morning. No medical evidence supports the suggestion of amnesia. A court-appointed psychiatrist, however, declared that ''I found no foundation for a period of amnesia. If you have any amnesia, which is, of course, loss of memory, you have no memory of what happens. Then when you speak of loss of memory, you mean as a rule, there is some organic

basis. That is, the loss of memory is the result of an organic disease of the brain, and there is no disease in his brain; and you do have loss of memory in other ways but they wouldn't apply to the act because they would be—first, you might have a hysterical loss of memory which would be the result of the crime, not the cause of it; you might have a loss of memory because of overindulgence of alcohol or something of that kind, but all these other losses of memory are things that come separate from an organic brain disease which is the fundamental cause of the loss of memory; and I find nothing there that would indicate that there was any loss of memory at the time.

"Therefore, I have to conclude that he must have been wrong about his statement that he didn't remember anything."

Furthermore, the record shows the following questions and answers:

"Q. Of course, this lapse of memory that the defendant is afflicted with is not caused by the fragments of this bomb that exploded on him or around or near him in the Mediterranean Sea? A. No, that wouldn't be possible because it didn't involve the brain.

"Q. Could the loss of memory in the defendant, or his amnesia be caused by the anti-personnel bomb and the concussion having thrown him a distance of ten or twelve or fourteen feet against the bulkhead of a ship? A. I don't see where it possibly could be caused by that and have him be in his present condition. If he had a loss of memory as a result of that he'd have a traumatic brain disease and he hasn't got that.

"Q. And I'll ask you the same question taking into consideration now that his mind was perfectly normal and his physique was perfectly normal before this accident, would you still give the same answer? A. I don't see how that would have any effect upon it at all."

Likewise, another court-appointed alienist testified as follows:

"Q. Does a person who commits a crime of violence while undergoing a spell of amnesia realize what he is doing? A. We do have people who commit crimes of violence while undergoing a spell of amnesia but they are also practically 99.9 percent epileptics. We very seldom have crimes of violence committed by amnesia patients excepting epileptics . . . I think any analysis of his life shows nothing that would

indicate insanity. And then we have that period between 8:00 o'clock in the evening until 2:00 o'clock next morning, in which we are to judge of his sanity or insanity. And we know that people do not become insane, as a medical condition at 8:00 o'clock and recover permanently at 2:00 o'clock. They may be temporarily deranged as a result of rage or jealousy, but they are not insane in the medical-legal sense, or in the medical sense.

"Therefore the only opinion I can evaluate as to this man's mental condition between 8:00 o'clock at night and 2:00 o'clock in the morning, in the period in which his wife is killed; and it is my opinion that the man was sane in that period. Because we don't have, as an entity, insanity occurring at 8:00 o'clock, with recovery at 2:00 o'clock."

As previously indicated, no evidence appears to have been improperly excluded from the trial on the general issue, and no showing is made of any prejudicial error at the trial on the plea of not guilty by reason of insanity. We have examined the entire record and, after such examination, are of the view that the verdict of sanity, as well as that of murder in the first degree, is overwhelmingly supported.

In · the interests, however, of a complete presentation of every aspect of the case one further matter deserves mention. The defendant at the age of 18, in 1934, enlisted in the United States Navy. He was at that time, apparently, a completely normal youth. He served his country honorably for 11 years and three months. He attained the rate of chief cook. He was wounded in action on August 18, 1944, by the explosion of an enemy anti-personnel bomb. His injuries are shown in the naval medical report hereinafter copied. After preliminary hospitalization in Italy for approximately 30 days defendant was returned to the United States. He spent about 30 days in a naval hospital on Long Island, was granted a 30-day furlough transfer in order that he could see his wife in San Francisco, and at the end of his furlough he reported to the Oak Knoll Naval Hospital. Defendant testified, "I was in Oak Knoll approximately thirty days . . . I was having headaches and dizzy spells . . . I was discharged from the hospital as being physically fit, and I was sent to Treasure Island." Defendant's subsequent medical history appears from the report hereinafter quoted. He was awarded 60 per cent disability rating and discharged on September 7, 1945. His official medical record shows: "Report of medical survey,

U. S. Naval Hospital, San Leandro, California, Date July 24, 1945, Diagnosis: psychoneurosis neurasthenia. Summary of case history: Patient is a 29 year old, married, negro, CCK, USN, with 11 years 3 months prior service with combat in the entire Mediterranean area. Patient was wounded by bomb fragments in the invasion of Southern France, sustaining fracture of right ulna and multiple wounds in the right side of back, and chest, and left arm. On 19 March, 1944, he was readmitted to U. S. Naval Hospital, Oakland, California, diagnosis No Disease, Convalescent Leave, disposition. He was then complainting of nervousness, tremors, sweating, irritability, pain and weakness, in the right forearm and hand. The area about the ulnar-scar was hypagelsia and hypesthetic and there was some restriction of motion. A neuropsychiatric consultant found that he had 'combat fatigue' and he was sent to duty 15 December 1944. He was admitted to U. S. Naval Dispensary, Hunters Point, San Francisco, California on 23 April 1945, D. U. Fatigue Combat, because of eposidic nervousness, following cramps, and diarrhea. On 23 April, 1945, he was transferred to U. S. Naval Receiving hospital and on 17 May 1945, to U. S. Naval Hospital, Oakland, California, and on 26 May 1945, to this activity. At this activity, patient complained of tension, irritability, insomnia, easy startle, battle dreams, anxious expectation, headache, backache, pain in chest anorexia and nausea. There is no family or previous personal history of neuropsychiatric disorder. Physical and routine laboratory examinations were negative. Neurological examination revealed gross tremors of head and hands, sweating, tachycardia, dilated pupils. X-ray of the chest revealed multiple small bomb fragments in the thoracic wall. On admission patient was tense, anxious, hyperactive, irritable and nervous. There was mild automonic instability. Under treatment, patient improved subjectively except for continued tension, poor morale drive and pain in the foot. On 21 July 1945, diagnosis was changed to 'psychoneurosis neurasthenia' by reason of error. It is the opinion of the board that Danielly's continued neurotic symptoms unfit him for further service; that maximum hospital benefits have been received; that he will, if discharged adjust to his preenlistment level. If discharged, he is not likely to be a menace to himself or to others and is not likely to become a public charge. He is considered fully competent to be discharged into his own custody. Present condition: unfit for service. Probable future duration: permanent. Recommenda-

tion: That he be discharged from the U. S. Naval Service."

That by the standards of law the defendant has not been rendered insane and that he is still legally accountable for his actions seems reasonably certain. But that he is a victim of war in the sense that his original emotional stability and related ability to cope with the vicissitudes and demands of living in normal society have been to some extent impaired seems also reasonably certain. Under such circumstances, regardless of what compassion might suggest, we are bound by the law of this state to affirm the judgment of conviction; that law does not vest in us the power of commutation of sentence. Only in the governor is that power reposed. (Cal. Const., art. VII, § 1; see *In re De La Roi* (1946), 28 Cal.2d 264, 276 [169 P.2d 363], and cases there cited; *In re Lindley* (1947), 29 Cal.2d 709, 728 [177 P.2d 918]; *People* v. *Tuthill* (1948), 32 Cal.2d 819, 827 [198 P.2d 505].)

Contentions of defendant not specifically discussed are so lacking in merit as to require no particular comment.

For the reasons above stated, the judgments and order appealed from are affirmed.

Gibson, C. J., Shenk, J., and Spence, J., concurred.

EDMONDS, J.—By the opinion of a majority of the court, the exclusion of certain evidence offered by Danielly for the purpose of showing "lack of deliberation and premeditation and malice aforethought, essential elements of the crimes of which he was convicted," was proper because such evidence "was not materially relevant to any theory of defense raised upon the trial of the general issue." This determination, which is a ruling upon the weight of evidence as a matter of law, a function clearly beyond the function of an appellate court, has deprived Danielly of the principal defense presented by him.

There may be some circumstances in which the sufficiency of tendered evidence determines its admissibility, but it is generally held that, although evidence tending to prove an issue, or constituting a link in the chain of proof does not, standing alone, justify a verdict, it is not, for that reason, inadmissible. "Relevancy does not depend upon the conclusiveness of the testimony offered, but upon its legitimate tendency to establish a controverted fact. Relevancy is that 'quality of evidence which renders it properly applicable in determining the truth or falsity of the matter in issue between

the parties to a suit'. Bouvier Law Dict. Rawle's Revision, 866.'' (*Interstate Commerce Com.* v. *Baird,* 194 U.S. 25, 44 [24 S.Ct. 563, 48 L.Ed. 860].) ''The mere circumstance that certain evidence may within itself fall short of proving a fact which the party offering it seeks to establish is not a sufficient reason for excluding it. Unless otherwise objectionable, it should be admitted, even though it may only tend to prove the matter in issue.'' (*Livingston* v. *Barnett,* 193 Ga. 640 [19 S.E.2d 385, 392-393].) This should be particularly true in a case where a defendant is being tried on charges of first degree murder. ''[T]echnicalities should be liberally viewed when urged against a defendant in a criminal case.'' (*People* v. *Bob,* 29 Cal.2d 321, 326 [175 P.2d 12] ; *People* v. *Yee Fook Din,* 106 Cal. 163, 166 [39 P. 530].)

The record in this case clearly shows that, by the proffered evidence, Danielly's counsel was attempting to disprove not only premeditation and deliberation, but also malice afore-thought, so that a reasonable doubt would exist in the minds of the jurors as to the defendant's guilt of either first or second degree murder. He conceded that Danielly might be found guilty of manslaughter although a reasonable doubt were raised as to his malice aforethought. The testimony offered for this purpose was excluded upon the ground that evidence tending to prove a state of mind may be received only upon the trial of the issue presented by the plea of not guilty by reason of insanity. Under these circumstances, the question as to the admissibility of such evidence upon the trial of the principal issue is before this court for decision.

In California, dependent upon other factors, an intentional homicide may constitute the crime of murder of the first degree, murder of the second degree, or voluntary man-slaughter (Pen. Code, §§ 189, 192). Common to all of them is the element of intentionally taking a human life. But the proof of premeditation and deliberation is also necessary to sustain a conviction of first degree murder. Lacking the specific intent to kill, the crime has not been committed, and proof of insanity is a complete defense to the charge because an insane person cannot form that intent.

The extent of insanity which will excuse an intentional homicide is measured by what has become known as the ''right and wrong'' test. (*People* v. *Willard,* 150 Cal. 543 [89 P. 124].) If the defendant knew the wrongfulness of his act he was not insane to the extent of avoidance of the penalty the law imposes for intentional homicide; he was capable of

and presumably did intend the act. The "right and wrong" rule is the legal test for establishing the sanity of one charged with crime, but it does not conform to the gradation and varieties of unsoundness of mind familiar to the psychiatrist. Other measures of mental capacity have generally been rejected as a defense to a criminal charge (irresistible impulse, *People* v. *Morisawa,* 180 Cal. 148 [179 P. 888]; partial insanity, *People* v. *Fountain,* 170 Cal. 460 [150 P. 341]).

If the defendant proves to the satisfaction of the court or jury that at the time of the killing he was insane within the meaning of the "right and wrong" test, he establishes legal insanity and he cannot be convicted of any crime of intentional homicide. But if the proof establishes the commission of the homicide by the defendant, and he fails to establish his defense of insanity, a determination must be made as to the particular crime which he committed. This requires a finding based upon the distinction between the two degrees of murder and voluntary manslaughter.

Primarily the distinctions between these crimes seem to be based upon the different shadings of intent. Thus murder in the first degree is malicious and premeditated (Pen. Code, § 189); murder in the second degree is malicious but not premeditated (see Pike, "What is Second Degree Murder in California?" 9 So.Cal.L.Rev. 112). Voluntary manslaughter is intentional but neither malicious nor premeditated; it is committed "upon a sudden quarrel or in the heat of passion." (Pen. Code, § 192.) The decisive factor in determining which crime has been committed is the defendant's state of mind at the time of the homicide. To establish this element, the prosecution may offer any evidence relevant to the issue. As tending to prove lack of guilt, there is admissible evidence of intoxication to the extent of affecting the mind of the defendant in such a degree as to result in incapacity for malice aforethought, as well as premeditation or deliberation. Under certain circumstances such evidence will support a conclusion that neither first nor second degree murder has been proved. (*People* v. *Chesser,* 29 Cal.2d 815 [178 P.2d 761]; *People* v. *Burkhart,* 211 Cal. 726 [297 P. 11]; *People* v. *Yeager,* 194 Cal. 452 [229 P. 40]; *People* v. *Clifton,* 186 Cal. 143 [198 P. 1065]; *People* v. *Selph,* 106 Cal.App. 704 [289 P. 918]; *People* v. *Tuthill,* 31 Cal.2d 92, 102 [187 P.2d 16].)

Other evidence relevant to the question of defendant's state of mind are the circumstantial facts showing timing between provocation, if any, and the act, as well as the relationship

between the defendant and the deceased. Similarly, as a matter of logic, evidence that the defendant was feeble-minded or had some mental infirmity is highly relevant to the issue of the *degree* of intent. Upon this issue it would be immaterial that such mental disorder was insufficient to negate entirely the existence of intent by satisfying the "right and wrong" test for legal insanity.

By legislation enacted in 1927, the plea of "not guilty by reason of insanity" was added to section 1016 of the Penal Code. The Legislature also directed: "All matters of fact tending to establish a defense other than . . . [prior conviction or acquittal, or former jeopardy, or not guilty by reason of insanity] may be given in evidence under the plea of not guilty." (Pen. Code, § 1020.)

Another statute provides: "When a defendant pleads not guilty by reason of insanity, and also joins with it another plea or pleas, he shall first be tried as if he had entered such other plea or pleas only, and in such trial he shall be conclusively presumed to have been sane at the time the offense is alleged to have been committed . . ." (Pen. Code, § 1026.)

The attorney general contends that these enactments preclude the admission of any evidence tending to establish unsoundness of the defendant's mind except upon the trial of the issue presented by the plea of not guilty by reason of insanity. The purpose of the amendments, he argues, was to remedy certain abuses which had grown up in connection with the defense of insanity in the trial of a charge of murder. But the abuse sought to be avoided was the confusion caused by the introduction of evidence tending to disprove the commission of the crime and that offered upon the affirmative defense of legal insanity. To avoid this confusion the Legislature provided for a separate trial of the issue which arises upon the defendant's plea of not guilty, and that which is presented upon the entry of the plea of not guilty by reason of insanity. However, the remedy which these enactments provided should not be extended to exclude evidence of mental unsoundness offered upon the trial of the general issue if such evidence tends to prove either incapacity or inability to have the intent which is an essential element of the crime charged. The legislative purpose, as expressed in the amendments, was to simplify the *issues* before the jury, and not to restrict the admission of evidence relevant to those issues.

By section 1026 of the Penal Code, upon the trial of the issue presented by a plea other than "not guilty by reason of

insanity," the defendant is "conclusively presumed to have been sane." Considering its context, this statute refers only to legal sanity, which this court has defined as the ability to understand the difference between right and wrong. The Legislature has dissociated the defense of insanity, that is the inability to have an understanding of the difference between right and wrong, from the trial of the general issue, but it placed no restriction upon the type of evidence admissible to disprove any of the elements of the substantive crime which the prosecution must establish. No change was made in section 1019 of the Penal Code which declares: "The plea of not guilty puts in issue every material allegation of the indictment or information." Upon such a plea the prosecution must prove intent, as well as deliberation and premeditation, to support a conviction of first degree murder. "Intent is a question of fact which may be proved like any other fact . . ." (*People* v. *Fewkes,* 214 Cal. 142, 148 [4 P.2d 538].) Condition of mind, insufficient to form an intent, is clearly admissible where the insanity plea is not made (*People* v. *Gherna,* 80 Cal.App.2d 519 [182 P.2d 331]), and it should not be inadmissible merely because later the defendant is to have an opportunity to offer evidence of insanity to a degree that acquits him of the crime.

In an early case, the Supreme Court of the United States stated the rule as follows: "But when a statute establishing different degrees of murder requires deliberate premeditation in order to constitute murder in the first degree, the question whether the accused is in such condition of mind, by reason of drunkenness or otherwise, as to be capable of deliberate premeditation, necessarily becomes a material subject of consideration by the jury." (*Hopt* v. *People,* 104 U.S. 631, 634 [26 L.Ed. 873].) This language is broad enough to include evidence of mental condition in every situation where, for any reason, the defendant is incapable of forming the state of mind requisite for the commission of the crime charged.

However, very recently, the court had before it a case in which the only error urged was the trial judge's refusal to give an instruction which would have permitted the jury to consider evidence of mental deficiencies, not amounting to insanity sufficient to acquit of the crime, but affecting the defendant's capacity for premeditation and deliberation. By a closely divided vote, the ruling was upheld upon the theory that the law of the District of Columbia, where the case arose, did not recognize the law of "partial responsibility" and the

Supreme Court would not force a contrary rule. (*Fisher* v. *United States*, 328 U.S. 463 [66 S.Ct. 1318, 90 L.Ed. 1382, 166 A.L.R. 1176]; see comments in 34 Cal.L.Rev. 625, and 56 Yale L.J. 957.) The Hopt case, *supra*, was distinguished as arising in a jurisdiction which ''had a statute specifically establishing such a rule.'' (P. 475.) The dissenting opinion of three justices pointed out that ''Between the two extremes of 'sanity' and 'insanity' lies every shade of disordered or deficient mental condition, grading imperceptibly one into another . . . [and] there are persons who, while not totally insane, possess such low mental powers as to be incapable of the deliberation and premeditation requisite to statutory first degree murder.'' The rule of the majority, the opinion continues, requires the jury either to ''condemn such persons to death on the false premise that they possess the mental requirements of a first degree murderer or free them completely from criminal responsibility and turn them loose among society.'' (P. 492.)

In *People* v. *Troche,* 206 Cal. 35 [273 P. 767], which was one of the first to be presented to this court after the Penal Code was amended in 1927, it was said (p. 47) : ''The insanity of a defendant cannot be used for the purpose of reducing his crime from murder in the first degree to murder in the second degree. If responsible at all in this respect, he is responsible in the same degree as a sane man, and if he is not responsible at all he is entitled to an acquittal in both degrees. This language, though broad in scope, is entirely consistent with a construction of section 1026 of the Penal Code as referring exclusively to proof of the issue of legal insanity. The statement was taken from a jury instruction considered in *State* v. *Maioni,* 78 N.J.L. 339 [74 A. 526, 20 Ann.Cas. 204] and approved with the comment that ''insanity is an affirmative defense.'' Clearly this court was there referring to legal insanity as measured by the ''right and wrong'' test and not evidence of unsound mind to prove lack of premeditation or malice as a defense within the issues raised by a plea of not guilty to a charge that the defendant committed a crime requiring proof of such intent as an essential element of the offense. However, in the Troche case and several others, the court held that since the enactment of section 1026 of the Penal Code no evidence of mental incapacity or instability may be admitted upon the trial of any issue other than that raised by the plea of not guilty by reason of insanity.

The same point now relied upon was presented by the defendant in *People* v. *French,* 12 Cal.2d 720 [87 P.2d 1014], where the evidence which was excluded upon a general objection of the prosecution was offered for the express and limited purpose of negating malice and premeditation. French shot and killed a rival newspaper publisher allegedly because of a protracted series of articles attacking and insulting the defendant and his family. He entered pleas of not guilty and not guilty by reason of insanity. Upon the trial of the general issue, certain of the articles were offered in evidence for the express purpose of showing that, at the time of the homicide, French was in a state of mind which made him incapable of premeditation. In upholding the rejection of this evidence, it was said: ''The only grounds upon which said articles could have been admissible at all on the plea of not guilty would have been on the theory that they contained threats . . .'' and thus supported a theory of self-defense. Three justices concurred in the judgment, one of whom noted: ''I am convinced, however, that the defendant suffered provocation that would weigh greatly in his favor.'' One dissenting justice stated: ''To my mind, it amounts to a denial of the application of the principle of 'due process' to adjudicate in effect that although the jury is required to fix the punishment that shall be imposed on an accused who has been found guilty of murder in the first degree, it must do so in utter ignorance of the facts which relate to the commission of the crime other than those which show 'the circumstances connected with the offense.' ''

Considering the rights of a defendant charged with an offense requiring proof of deliberation, premeditation or malice aforethought in connection with section 1026 of the Penal Code, the evidence in the French case should have been received. Clearly, a condition of mind is a question of fact from which the jury may determine the degree of the crime in the trial upon the plea of not guilty. There is a broad distinction between legal insanity, as measured by the ''right and wrong'' test, which excuses the accused from all responsibility for his acts, and that lesser degree of disordered intellect rendering a person incapable of forming a design to kill and bearing upon the grade of his criminality. The ''right and wrong'' test as to whether a defendant is so insane as to be wholly irresponsible for crime, ''is no answer to the basic question: How can one justify holding a person guilty of a deliberate and premeditated killing when he did not

deliberate and premeditate, and, indeed, was incapable of deliberating and premeditating?'' (Weihofen and Overholser, Mental Disorder Affecting the Degree of a Crime, 56 Yale L.J. 957, 972.) The same rule that permits proof of intoxication as bearing upon the question of malice, should permit evidence of a disordered mental condition, however produced. As said by one court: ''The important circumstance is the disordered intellect, not the means by which it was produced.'' (*Hempton* v. *State*, 111 Wis. 127 [86 N.W. 596, 598].)

Moreover, as to the sufficiency of the evidence, it should be pointed out that Danielly was not attempting to prove an affirmative defense, as the majority opinion implies. The prosecution bears the burden of proof of premeditation and deliberation beyond a reasonable doubt. Ordinarily, as in the present case, there is no direct evidence of premeditation, deliberation or of malice aforethought, and proof of them must be based upon inferences which reasonably may be drawn from the surrounding circumstances of the killing. The effect of the holding, in the majority opinion, as to the sufficiency of the evidence casts the burden of disproving premeditation and other intention upon the defendant, whereas up to the present time a defendant has had only the burden of raising a reasonable doubt as to the essential elements of the crime. (See *People* v. *Cornett, ante,* pp. 33, 43 [198 P.2d 877] ; *People* v. *Thomas,* 25 Cal.2d 880, 895 [156 P.2d 7] ; and concurring opinion of Mr. Justice Traynor in *People* v. *Albertson,* 23 Cal.2d 550, 587 [145 P.2d 7].) It is obvious that as to degree, the sufficiency of evidence in a case where a defendant has the burden of proving an affirmative issue is greater than in the case where a defendant need only raise a ''reasonable doubt'' as to an issue which must be proved by the prosecution.

Danielly did not attempt to prove affirmatively by the offer of the excluded evidence that he was in a ''heat of passion'' at the time of the killing, as is suggested by the majority opinion. His counsel offered evidence to dispel the inferences of malice aforethought, premeditation and deliberation so that only an inference of ''heat of passion'' would remain and he would, therefore, not be guilty of more than manslaughter. That evidence certainly ''tends to throw light on a fact in dispute'' (*People* v. *Adamson,* 27 Cal.2d 478, 485 [165 P.2d 3] ), for it would tend to dispel the inferences of premeditation, deliberation and malice aforethought which might be drawn from the testimony presented by the People.

But even if Danielly were attempting to prove an affirmative defense, the probability of his not being able to do so should not be the basis for excluding evidence in a criminal case. As said by this court in reversing a judgment of conviction in a case where the defendant was attempting to show a state of mind where intent was an element in the offense charged: "The ability of the defendant to establish what he offered to prove may seem to be highly improbable, but we cannot admit that for this reason his offer should have been rejected. We cannot say that it is impossible for the defendant to sustain his offer of proof. Unless it is clearly impossible to make such proof it cannot, as a matter of law, be affirmed that the defendant should be debarred from making the trial." (*People* v. *Blake*, 65 Cal. 275, 279 [4 P. 1].)

A defendant who, because of mental disorders short of insanity, was incapable of premeditating and deliberating upon the commission of a homicide, cannot be guilty of a crime which by definition requires these mental elements. The evidence offered by Danielly concerning his mental status should have been received for the limited purpose of tending to prove whether or not he shot his wife or Elva Sam with either a specific intent or deliberation and premeditation, and the adverse ruling constitutes prejudicial error.

For these reasons, in my opinion, the judgment and the order denying a new trial should be reversed and the cause remanded for a new trial.

Carter, J., and Traynor, J., concurred.

CARTER, J.—I dissent.

There can be no doubt that under the rule announced in *People* v. *Wells, ante,* p. 330 [202 P.2d 53], evidence of defendant's mental condition was admissible on the trial of the issue raised by the plea of not guilty. This case presents a good illustration of the confusion that results from the rule announced by the majority opinion in that case. But in addition to that, the majority opinion here misconstrues the record and is unsound in other respects. It holds that the denial of the proffered testimony of the defendant's mental condition was proper because: (1) The offer of proof was insufficient, and (2) The evidence was irrelevant.

On the first point, it is said: "The asking of questions, unless they disclose the proof expected to be adduced, is not the equivalent of an offer of proof." That purported rule is

subject to a well-established exception that an offer of proof is not even necessary or at least it may be most general where the court has indicated that it will exclude all evidence of that character. (*Heimann* v. *City of Los Angeles,* 30 Cal.2d 746 [185 P.2d 597]; *Lawless* v. *Calaway,* 24 Cal.2d 81 [147 P.2d 604]; *Tomaier* v. *Tomaier,* 23 Cal.2d 754 [146 P.2d 905]; *Caminetti* v. *Pacific Mut. Life Ins. Co.,* 23 Cal.2d 94 [142 P.2d 741]; *People* v. *Duane,* 21 Cal.2d 71 [130 P.2d 123].) In the instant case, the record as recited in the majority opinion demonstrates beyond doubt that the court would *not* allow the introduction of *any* evidence on defendant's mental condition. For illustration, with respect to the questions asked of Dr. Mooslin, it is conceded that the object of the questions asked was to dispel "malice aforethought." The questions were directed solely at defendant's mental condition—to his emotional and nervous disability. The doctor was never given an opportunity to state the nature of the condition or the effect it had on defendant's mental state. The questions imply that he had a nervous and emotional instability. That is no different than the "nervous tension" involved in *People* v. *Wells, supra.* But the majority opinion erroneously asserts that "Defendant did not even offer to show the nature of his 'nervous disability.' " He did all he could in the light of the court's rulings. Defendant is condemned for not showing that which the trial court would not permit him to show. Forms and sufficiency of offers of proof and objections to evidence are not to be strictly examined in criminal cases and especially not where a man's life is at stake as this court announced in *People* v. *Bob,* 29 Cal.2d 321, 325 [175 P.2d 12]: "Notwithstanding the rule that the specific ground for an objection must be given and the particular portion of evidence which is inadmissible must be pointed out where other parts are admissible, 'technicalities should be liberally viewed when urged against a defendant in a criminal case. And the mere fact that the objection could have been made in better form will not justify a refusal to consider it, where the intention of the defendant could not be misunderstood. So also if it is evident from the discussion over an objection between the court and counsel that another ground of objection perfectly obvious from the nature of the question, would have been overruled if made, this ground will be considered on appeal.' (8 Cal.Jur. 503.) (See *People* v. *Boggess,* 194 Cal. 212 [228 P. 448]; *People* v. *Shattuck,* 109 Cal. 673 [42 P. 315]; *People* v. *Yee Fook Din,* 106 Cal. 163 [39 P.

530]; *People* v. *Darby,* 64 Cal.App.2d 25 [148 P.2d 28]; *People* v. *Converse,* 28 Cal.App. 687 [153 P. 734].) It is said in *People* v. *Yee Fook Din, supra,* at page 166: 'Appellant could thus have brought here a record presenting his point in a clearer light; but *technicalities should be liberally viewed when urged against defendant in a criminal case.'* [Emphasis added.] It is aptly said in *People* v. *Converse, supra,* at page 691, where the objection of immaterial matter rather than *hearsay* was held sufficient: 'It will not do to say that the ruling complained of was free from error because counsel for the defendant did not see fit to object specially upon the ground that the question called for testimony which in addition to being immaterial was incompetent because hearsay. Objections to questions calling for inadmissible testimony are designed and are required for the purpose of directing the attention of the trial court and of opposing counsel to the particular vice of the testimony sought to be elicited by the question; and it is the general rule that the efficacy of an objection is dependent upon the precision with which it is made. In the present case, however, *upon its face the character of the question must have fully apprized the trial court of the hearsay nature of the testimony called for; and it is evident by the discussion of the objection indulged in between the court and counsel that an objection upon the ground of hearsay would have been overruled* upon the theory that, notwithstanding its hearsay character, such testimony was admissible upon redirect examination as a material and undisclosed portion of a conversation called for and narrated upon cross-examination. Obviously therefore it would have been useless to have specified incompetency as an additional ground of objection; and this perhaps was one of the reasons why counsel for defendant failed to do so.' [Emphasis added.] In *People* v. *Boggess, supra,* at page 232, it is said: 'While it is true ordinarily that an objection to evidence must be sufficiently specific to inform the court of the scope of the objection, nevertheless, where the record shows, as it does in the instant case, that all the parties, including the court, must have understood the purpose of the objection, it will not be said that the objection failed of its purpose.' Such is equally true in the case at bar. The court said in *People* v. *Darby, supra,* at page 33: 'We do not feel inclined to deprive defendant of his right to demand that he be tried with competent evidence because of the oversight of his counsel in the midst of a difficult trial to remember that he should add the word, hearsay, to the

statement of his objection.' " Likewise, in the instant case no one can doubt what evidence defendant's counsel was attempting to introduce. *Moreover it should be observed that until the case of People* v. *Wells, supra, decided after the trial in the case at bar, neither counsel nor the court* were apprized of the rule that evidence of mental condition bearing upon intent, malice, premeditation and the like was admissible, *and thus it was to be expected that the trial court would exclude all such evidence and that defendant's counsel would not make as precise and full an offer of proof as could have been done.* Hence, it should not be too late to rectify that error and in a new trial give full opportunity to apply the rule of *People* v. *Wells, supra.*

On the point of relevancy, the majority seems to find immateriality because the evidence was offered on "heat of passion" rather than malice and premeditation and that it was not pertinent to that issue. Assuming it was not, viewing the whole record, I do not believe the offer was so limited by defendant's counsel. While he spoke of "heat of passion" he also referred to malice and frame of mind. But in addition to that, the testimony of Dr. Mooslin was offered *for the specific purpose of dispelling malice and it is so conceded by the majority opinion.* The only answer of the majority opinion as to the relevancy of that evidence is that defendant did not show how his nervous and emotional disability affected the absence or presence of malice. How can he be penalized for that when *the trial court prevented him from showing such relevancy by that very witness?* In other words, the majority opinion holds the evidence irrelevant because defendant did not establish its relevancy, and at the same time, approves the action of the trial court in preventing defendant from showing its relevancy. I do not believe that such reasoning is conducive to the orderly administration of justice.

It seems crystal clear to me that under the rule announced in *People* v. *Wells, supra,* the evidence of defendant's mental condition offered on behalf of defendant in this case was admissible on the trial of the issue raised by the plea of not guilty, and that had the trial judge been aware of such rule, he would have permitted the introduction of such evidence. To now hold, as does the majority, that the trial court was justified in excluding such evidence, is, in my opinion, the denial, on purely technical grounds, of the right to present the only defense available in a case of this character. The

result of such denial can be nothing short of a miscarriage of justice.

I would, therefore, reverse the judgment.

Appellant's petition for a rehearing was denied February 21, 1949. Edmonds, J., Carter, J., and Traynor, J., voted for a rehearing.